OF

# THE DECISIONS

OF

# THE SUPREME COURT OF ALABAMA.

*JUNE TERM, 1833.*

---

TRUSTEES OF THE UNIVERSITY OF ALABAMA *vs.* WINSTON.

5sp 17
143 500

1. A prayer of Oyer of a bond sued upon, and omission to crave oyer of the condition, where the evident intention of the defendant is to reach the condition, is a mere formal defect, amendable at any stage of the proceedings.

2. The omission to crave oyer of the condition of the bond, in such case, where upon craving oyer of the bond, the bond and condition are read to the defendant, is not error.

3. The question of the right of the Trustees of the University, to sustain an action upon a bond, (given for lands,) after a forfeiture thereof has accrued. may properly arise on demurrer to the delaration—it containing no averment of any fact which would authorise the suit.

4. The Trustees of the University of Alabama, compose a public corporation, entirely within the control of the Legislature; and the latter has authority, by the passage of any statute, or statutes, to alter, amend, vary or enlarge the original acts of incorporation.

5 s. & p.          3

5. The acts of the legislature of 1821-2, providing for a sale of the University lands, imposed an absolute forfeiture of the lands, as a penalty for failing to make punctual payment of the purchase money; so that bonds, given under the provisions of those statutes, for University lands, are not recoverable, unless put in suit within three months after due.

6. It would seem that the vendee of such lands, under those acts, would have no right to pay the purchase money at any time within the three months after the payments became due, and thus prevent a forfeiture.

7. The title of a purchaser of these lands, is purely equitable, and the fee simple remains in the Trustees of the University, until the whole purchase money is paid: so, a failure to discharge the instalments, *at the day due*, creates an absolute forfeiture, and vests the whole title immediately in the trustees, and discharges the vendee's bonds.

8. An election of the trustees, however, to sue upon the bonds of the vendee, must be made within three months after they fall due, and they must be sued, within that time, or not at all.

9. Where the trustees elect to pursue their remedy upon the bond, and do sue within three months after forfeiture, the equitable title of the vendee, which has been divested by a forfeiture, becomes revested by the suit, and continues until a failure to collect the money by suit.

10. In such case, a judgment and execution, the result of such suit, can not be continued in force, with the intention of procuring their satisfaction in future; but in the event of a *ca sa*, returned *non est*, or *fi fa.*, *nulla bona*, the land being protected from execution, becomes forfeited, and when resorted to under the law, satisfies the whole judgment.

Error to the Circuit Court of Franklin.

The Trustees of the University of Alabama, by attorney, declared against John J. Winston, in debt, upon several bonds, for the payment of money.

The writ in the action, was issued on the third day of January, 1831; and the bonds were due and payable—*the first*, on the third day of October, 1829;

*the second,* on the third day of October, 1830; *the third,* on the sixth day of June, 1829; *the fourth,* on the sixth day of June, 1830; and *the fifth,* on the fourth day of March, 1830. Each of these bonds contained a condition, wherein it was recited, tnat they were severally executed in consideration of the purchase, by the obligor, of sundry tracts of land, from the Trustees of the University of Alabama.

The defendant craved oyer of the bonds, which, together with the bonds and conditions, being read, he demurred to the declaration; and his demurrer was sustained, and judgment entered for him.

The plaintiff having, by writ of error, removed the cause into this Court, assigned as ground of reversal—

*First*—That the Court erred, in sustaining the demurrer of the defendant, in the Court below.

*Secondly*—The Court erred, in not overruling the demurrer of the defendant.

This case was argued, most ably, by *Erwin* and *Stewart,* for the plaintiffs in error, and by *Hopkins,* contra; and involved the construction of a portion of the act of the legislature, under which the Trustees of the University were empowered to dispose of the lands granted to the State of Alabama, for the purpose of establishing a State University.*

TAYLOR, J.—The only assignment of error in this case, is, that the Circuit Court sustained the defen-

*Vide* Aiken's Digest, 432, §30.

dant's demurrer to the plaintiff's declaration. This assignment is sufficient, however, to bring all the points, which can be made in the cause, in review before us.

. Some questions have been made with regard to the form of the proceedings, in the Court below, which must be disposed of, before we undertake an investigation of the merits.

First—It is insisted, that the demurrer can only reach the bonds declared on, and that the conditions to those bonds can not be considered, as oyer of the bonds alone, was craved.

The declaration is upon several bonds, without setting out any conditions. The defendant craved oyer of the bonds, and thereupon the bonds, with the conditions, are stated to have been read to him, and are inserted in the record: upon which the defendant demurred.

As no objection was made to the bonds, but the sole object was to contest the liability of the defendant to be sued in the manner he has been, for any possible breach of the condition; if the condition can not be considered, the judgment must be reversed.

It is deemed unnecessary to enter into an examination of the effect of granting oyer of an instrument, when it is not craved. Although the bond and condition are so far separate instruments, that oyer of each should regularly be asked, when the defendant wishes both to be read to him: yet if it appears evident, that the defendant wished to reach the condition, and the bond and condition are both set out upon the prayer of oyer of the bond only, it

is evident, that the defendant would, at any stage of the proceedings, be permitted to amend, by inserting a prayer of oyer of the condition; although he might previously have demurred or pleaded. It would be a mere formal defect, the record would not be materially changed, nor would any party be taken by surprise. Whatever amendment might have been made in the Court below, will here be considered as made; therefore, in the omission to crave oyer of the condition at the proper time, when the condition was set out upon the prayer of oyer of the bond, there was no error.

It is next contended, that a demurrer was not the proper mode of raising the objections to the suit on the bond; but that this should have been by plea.

If the plaintiffs would have been authorised to show any thing by replication, enabling them to maintain their action, which might have been omitted in their declaration, then a plea would have been the proper defence. For instance, if it be conceded, that a failure to sue upon the bonds, within three months after their maturity, produced an absolute forfeiture of the land, and of course a satisfaction of the bonds; yet if the plaintiffs had sued within that time, and been defeated without a trial upon the merits, that this would have prevented a forfeiture, and preserved to them a right of action. Could the fact of such previous suit and failure have been shown by replication in the second action? or would it be so necessary to sustain the plaintiffs' right to sue, that they must allege it in their declaration? We incline to the opinion, that if a fact of this kind would have authorised the plaintiffs to sue, after the three

months had expired, and if they could not have done so otherwise, they must have averred it in their declaration; and we do not perceive that the plaintiffs, under any circumstances, could be aided by a replication.

We come now to consider those points which affect the merits of the case. The argument has been elaborate and able, and we are much indebted to the counsel for the facilities which their industrious research has afforded us, and the great aid which we have received from the ability with which every material question has been discussed.

It is first contended, for the plaintiffs in error, that this is a private corporation; that it was first created by contract, and that any material alteration of the original charter, by the General Assembly, without the consent of the corporators, is unconstitutional.

It probably would be a sufficient reply to this objection, to say, that the corporators have assented to, by acting under every statute amendatory of the original act constituting them a corporation, which has been passed. The bonds sued on, were taken in conformity with the requirements of the statute of 1822, amending the original law of 1821. We will, however, examine the position apart from this consideration.

Probably a fuller investigation of the distinctive characteristics of public and private corporations, can no where be found, than in the celebrated case of the "*Dartmouth College* vs. *Woodward*," decided by the Supreme Court of the United States, and reported in 4 *Wheaton*. It is admitted throughout the

argument and in the opinion of the Court, in that case, that if the property possessed by a corporation is altogether the property of the State, if the corporators have paid and done nothing, amounting to a valuable consideration for the act of incorporation; in fine, if there is no contract upon valuable consideration between the State and the corporators, it is a public, not a private corporation. If it be public, it is certainly within the complete control of the General Assembly.

The counsel for the Dartmouth College, in the argument, ask, "if the property of this corporation be public, when did it become so?"

The opinion of the Court is rested entirely upon that clause in the Constitution of the United States, which declares, that "no State shall pass any law impairing the obligation of contracts." This language is used in the opinion, (page 627)—"It can require no argument to prove, that the circumstances of this case constitute a contract. An application is made to the Crown for a charter to incorporate a religious and literary institution. In the application, it is stated that large contributions have been made for the object, which will be conferred on the corporation, as soon as it shall be created. The charter is granted, and on its faith the property is conveyed. Surely in this transaction, every ingredient of a complete and legitimate contract, is to be found."

Again, on page 629–30—"If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or *if the funds of the College be public property*, or if the State of New Hampshire,

as a government, he alone interested in its transactions, the subject is one in which the Legislature of the State may act according to its own judgment, unrestrained by any limitation of its power, imposed by the Constitution of the United States."

Does the act of incorporation, in the case at bar, form a contract upon valuable consideration?

If it does, what is the consideration from which the members of the corporation or any other person, has parted, or what risk do they run, or labor have they undertaken, to form that consideration? It is true they have many services and duties imposed upon them, by the charter; but for all these, they have compensation allowed them out of the funds of the institution. But whence are these funds derived? They are altogether public property. The lands from which they accrue, have been granted to the State by the United States, for the purpose of endowing a University, it is true, yet the property in these lands is not the less in the State because the purpose to which they are to be appropriated is restricted in the grant.

Chief Justice *Marshall*, in the same opinion from which the foregoing extracts are made, also says— "the character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes."

What is the corporation, consisting of the President and Trustees of the University of Alabama, but an

" instrument of government, created for its purposes ?" It is true this instrumentality is confined to the disposition of a particular part of the public domain, the collection and appropriation of the proceeds in a particular way, the erection of College buildings, and other duties attendant upon the establishment and support of an institution of learning. Yet this institution is, in every respect, a public one, originated and prosecuted by legislative enactment, towards which no citizen has contributed one cent, either in money, other property, labor, or services, even as a trustee, without pecuniary remuneration.

It is useless to refer to other books, to prove that this is a public corporation. Authorities might easily be multiplied, but it would be a work of supererogation.

While we would unhesitatingly maintain the doctrine that an act establishing a private corporation, forms a contract by which the State is bound, we have no doubt but the President and Trustees of the University of Alabama, constitute a public corporation, and that their charter may be altered, amended, or repealed, by the General Assembly, at pleasure.

The power of the Legislature to provide that lands sold by the Trustees shall be absolutely forfeited, by the failure of a purchaser to comply with his contract, has been agitated during the argument. We did not understand the counsel for the plaintiffs to contend, that no such power existed, but rather that expressions conveying this meaning, would not be literally construed, and that the language used, must be stronger than ordinarily would be required, before this construction would be given to it.

5 s. & p. 4

Should the opinion of the Court respond to this doctrine, how could it be acted on? All that we can look for in a statute, is the clear intention of the Legislature. If words are used, plainly expressing that intention, we must be equally bound by them in one case, as another. In contracts between individuals, if an absolute forfeiture be plainly expressed to be the consequence of a breach, by one of the parties, the Courts of Chancery will often determine against this plain language; not from any doubt of the intention of the parties, but because the law affords relief in many cases of hardship, against such intent. At common law, although by the terms of a contract a forfeiture is the consequence of a breach, yet it is a general rule, that the party entitled to it may waive the forfeiture; and if he does so, the other party can not insist upon it, for as he committed the breach, he can not insist upon a benefit from his own default. Therefore, it is necessary, that some act should be done by the party entitled to the forfeiture, showing that he claims the benefit of his contract; or he will be considered as having waived it. As the Courts of common law had to give effect to contracts, it followed, as a consequence, that they had to give construction to them; and they have determined, that no matter how strong the language of an instrument may be, to show an intention that there should be a forfeiture at all events; yet, these rules shall be applied to them, to prevent injustice; therefore, we must suppose, that private contracts are made with a view to these decisions.— When, however, a statute is brought to bear upon a contract, and its meaning is plain and unambiguous,

that intention must be executed, although the judgment would be different from that which the common law would pronounce upon the same contract.

For these reasons, if the acts constituting the corporation, and providing for the sale of the University lands, do, when construed altogether, clearly mean, that the lands purchased by the defendant in error, should be absolutely forfeited to the vendors, upon the failure of the vendee to make the stipulated payments, then the happening of the event has produced such result, and the plaintiffs must be content to receive the land in satisfaction of their demands against the defendant, whether it be more or less valuable.

To determine this question, it is not necessary to refer to the decisions which are scattered through the books, in which the Courts have decided what did, and what did not amount to a forfeiture at common law; these litigations between individuals, will afford us no light, whatever, on this subject. All that we want is to arrive at a true construction of the statute. If there has been no absolute forfeiture provided by that, then a resort to the construction which has been given by Courts of justice, to such contracts at common law, will be necessary. But to determine whether the law does declare a forfeiture to be the effect of a breach, we must look alone, to a proper construction of the statutes; when the intention of the Legislature is known, it is the duty of this Court to carry it into execution.[a]

The latter part of the 4th section of the original act of incorporation,[b] empowers the Trustees "to grant, bargain, sell or assign, any lands, tenements, goods or chattels, in such manner as is hereinafter specified."

[a] 3 Cranch, 351; 8 ibid, 408-'9; 11 Johns. 331; 14 ib. 128.
[b] Dig. 553.

A subsequent part of that act provides as follows: Sec. 14. "All the lands which this State has received as a donation from the Congress of the United States, for a seminary of learning, shall be vested in said trustees, who shall dispose of the said land in such manner as shall be best calculated to promote the object of said grant: *Provided however,* that the minimum price on said land, shall not be less than seventeen dollars per acre; *and provided further,* that one-fourth part of the purchase money shall be paid at the time of sale, and the remainder divided into four annual instalments.

"Sec. 15. *And be it further enacted,* That the said Trustees of the University of Alabama, upon receiving from any purchaser of any tract or parcel of land, which they are authorised to sell, as aforesaid, the one-fourth part of the purchase money, so required to be paid as aforesaid, shall issue to such purchaser, a certificate, that the purchase of such tract of land has been made by such purchaser, that he has paid the fourth part of the purchase money, and declaring that upon the punctual payment of each and every one of the remaining instalments, (the amount of each of which instalments shall be specified in such certificate) they will convey such tract of land to such purchaser, or his heirs, &c.; and should such purchaser assign such certificate, the assignee shall possess all the rights which may have been vested in his assignor."

"Sec. 16. *And be it further enacted,* That should any person who may purchase any tract of land from the said Trustees, as aforesaid, or the assignee of such purchaser, fail to make punctual payment of

the amount of any one of the instalments which may become due on said tract of land, the land shall be *absolutely forfeited* to the said Trustees, with the money paid thereon: and the said trustees may, and they are hereby authorised, after the expiration of three months from the time of such forfeiture, to dispossess any person or persons as may be in possession of such tract of land, by the writ of unlawful detainer: *Provided*, That such purchaser or his assignee, may, at any time within three months after the time at which the first instalment may fall due, which such purchaser or his assignee may fail to pay as aforesaid, execute a bond or bonds with good and sufficient personal security, for the payment of each of the instalments which may remain unpaid, by the times they shall respectively become due; and in such case, the land shall remain in the possession of such purchaser, his or her assignee: *and provided also*, that should the said Trustees be unable to collect the monies which may become due on the bond or bonds which may be given in the manner herein before required, by reason of the insolvency of the obligors, or for other causes, then said Trustees may direct an execution, which may be sued out on any judgment which they may recover on any such bond, to be levied on such land," &c.

The language of the section last quoted, is, that in default of payment, the land shall be *absolutely forfeited*. This would seem to leave to the Trustees or party, no alternative: whatever title the purchaser had obtained, is *ipso facto*, re-vested in the Trustees. It is true, the purchaser may retain his land by giving bond and security according to the

terms of the statute, within three months, and his possession, during that time is assured to him, but this can not change the relation of the parties until the bond, &c., be given.

It is insisted, that a forfeiture can not take place without the assent of the vendors; that some act of theirs, showing that they claim the benefit of the forfeiture is necessary to make it one; and that it is against every sound principle, to permit the vendee to set up the forfeiture, and thus take advantage of his own breach of contract. It will be seen, however, by an examination of this section, that the vendee is to make the election of forfeiture, or no forfeiture. He may, within three months, give bond and security, and retain the land—thus, in fact, having the privilege secured to him, of re-purchasing the land, at the price he first agreed to pay. It is a sort of right of pre-emption, which is vested in him, for the three months; and for that time the possession is secured to him, to enable him advantageously to exercise this right.— Were he to be dispossessed immediately, although he might intend to take advantage of the privilege thus secured to him, another might obtain possession in the mean time, and thus put him to inconvenience and expense.

The statute declares, that the land shall be " absolutely forfeited:" stronger language could not possibly be used. It is not unreasonable to understand the legislature as intending to give to the purchaser the right to forfeit the land, if he found it most advantageous to do so. It is the dealing of the government with its citizen. It is not the interest of the former to impoverish the latter, even to increase its

own treasures. May we not well suppose, that the State had no intention of resorting to other property of the purchaser, to obtain payment for the land?— That it was considered, that the State would be sufficiently secured by the land, with the power of ousting the purchaser in a summary way, and the one-fourth of the purchase money already paid? This view of the case is greatly strengthened, by the circumstance, that no note or bond, for the balance of the purchase money, was required of the purchaser: he executed no instrument, himself, but simply received from the trustees, a certificate of his having made the first payment, by which they agreed to make him a title, if the subsequent payments should be punctually made.

This construction is strongly sustained by the history of the public domain, within this State, nearly all of which is, or has been the property of the United States. Until within a few years last past, the general government disposed of its lands under what was termed the credit system; and great quantities of the lands now held by our citizens, were purchased in that way. By the laws of the United States, as they then existed, one fourth of the purchase money was required to be paid at the time of the purchase; and the register of the land-office gave the purchaser a certificate, certifying that he had paid this fourth, and that, upon his paying the remainder in equal instalments, in two, three and four years, he would be entitled to a grant. If the purchaser failed to make full payment within one year after the last instalment became due, the land and first payment were forfeited. No note or bond was taken

from the purchaser, and the only paper which was executed, was this certificate, by the register. In this case, too, if the land, at a subsequent sale, brought more than was due to the United States, upon the first, the first purchaser was entitled to the excess.

It has been argued, that after the purchase made from the trustees, the land might deteriorate in value; that the mode of cultivation, and waste effected by the purchaser, might produce that deterioration. All these objections operated much more forcibly under the law of Congress—yet it was never doubted, that after holding the land the five years, he might either pay for it, or forfeit it, as he chose; and his continuing his possession, after the expiration of the five years, gave the United States no claim upon him.

The act incorporating the Trustees of the University of Alabama, so far as respects the provisions which it contains for the sale of lands, corresponds so nearly to the laws of Congress, regulating the sale of the public domain; during the credit system, so many of the lands within this State were sold under that system; and the members of our General Assembly, who passed the charter, were so intimately acquainted with it, that we must think it was intended to place forfeitures by purchasers, upon the same footing that they stood upon by those laws of Congress.

In December, 1822, an act was passed, to repeal, in part, and amend the act incorporating the Trustees of the University.

This act varies, in some respects, the mode of selling the University lands. The eighth section de-

clares that the title of the lands, received as a dona-tion from Congress, for a seminary of learning, is thereby vested in the trustees and their successors, to be appropriated in the manner therein directed: it proceeds thus—" The said lands shall be sold at public auction, at such times and places as the said trustees shall direct, or have, by ordinance, hereto-fore directed, at a price not less than seventeen dollars per acre: one fourth part of the purchase money shall be paid down at the time of sale; one eighth part in one year thereafter; with interest at the rate of six per cent. per annum; one eighth part in two years after said sale, with interest, as aforesaid; and the residue of the purchase money shall be paid at the expiration of eight years after the said sale, with interest, as aforesaid, payable annually, to commence at the day on which the third payment shall become due. And each and every purchaser shall, at the time of said purchase, execute his bonds, payable to the said trustees, and their successors in office, con-ditioned for the true and punctual payment of the purchase money and interest thereon, according to the terms of said sale."

The ninth section requires, that the trustees shall issue certificates to the purchasers, and contains the following proviso: " *Provided*, that the purchaser of any tract of land, as aforesaid," &c. " shall have the liberty, at any time, within the period of credit here-in before given, *if the land shall not have been forfeited*, of paying to the said trustees, the whole amount of principal, and the interest then due upon said pur-chase; and thereupon shall receive a conveyance," &c.

5 s. & p.                5

The tenth section is as follows : " Should any purchaser of any tract of land, as aforesaid, the heirs or the assignees of such purchaser, fail to make punctual payment of the amount of principal and interest, which may become due on said tract of land, the said tract of land shall be *absolutely forfeited* to the said trustees, with the money paid thereon ; and the said trustees may, and they are hereby authorised, upon the expiration of three months, from the time of said forfeiture, to dispossess any person or persons, who may be in possession ,of such tract of land, by the writ of unlawful detainer—saving, in every case of a forfeiture, the growing crop to the occupant : *Provided, nevertheless*, that if the said trustees shall, within the said period of three months, institute a suit upon the bond, given for the said purchase, in that case, the said forfeiture shall not accrue, until a failure of said suit to coerce the payment of the money due as aforesaid, which failure shall be ascertained by a return of *non est inventus*, to a *capias ad respondendum*, or of *nulla bona*, to a *fieri facias*."

The three following sections give the right to the purchaser, after failure to make a payment, within three months, to convert his purchase into a lease, for ninety-nine years, renewable forever, by paying all interest, &c. This provision, however, has nothing to do with the question before us.

Does this statute so alter the situation of the parties, from what it was under that of 1821, as to require any act to be done by either, to produce a forfeiture, after a failure of the purchaser to make a payment, which was not necessary before?

The language with respect to the forfeiture, is the same : " the land shall be *absolutely forfeited;*" but, in some respects, the parties are differently situated.— Under the last act, bonds have to be given by the purchaser, which were not required by the first; the trustees have, also, the additional privilege of suit within three months after failure to pay, by the purchaser ; which, according to the express words of the act, would prevent the forfeiture from accruing, until a failure to coerce payment.

It has been strongly urged, that it could not have been the intention of the legislature to produce an absolute forfeiture, upon the failure to pay : that the idea of such intention is rebutted, by the trustees having three months given them to determine whether they will insist upon an immediate forfeiture, or pursue the purchaser by suit : that, if the trustees have three months to determine whether they will elect to insist upon the forfeiture, or sue for the money, the purchaser, within that time, would have the right to elect to pay the money; and that, therefore, no absolute forfeiture can have taken place.

If the construction given to the first statute, be correct, it will will have considerable effect in ascertaining the intention of the legislature, from the language used in this. The words expressing the forfeiture, are the same, and, of themselves, must receive the same construction—being used by the same body. There may, however, be other provisions in the statute, restraining their import ; are there any such ?

Whether the purchaser would have the right to pay the money, within three months after it was due, and thereby prevent a forfeiture, is probably not a

very important inquiry; but if it is, we believe he would have no such right. The proviso, in the ninth section, seems to settle this question. That proviso declares, he "shall have liberty, at any time, *within the period of credit*, to pay the whole amount of the principal and of the interest which has then accrued," &c. "*if the land shall not have been forfeited.*"— That is, as the statute must be understood, if the event has not occurred, which is declared to produce a forfeiture. This event is a failure to make punctual payment; therefore, after a failure to make such payment, all that he has a right to do, to authorise his retaining possession of the land, is to pay the interest, give bond and security for the rent, and thus convert his purchase into a lease, for years, under the subsequent provisions of the act.

But, it is said, the forfeiture can not be absolute, on account of the election, which is in the power of the trustees for three months, either to pursue the remedy, by suit on the bond, or rely upon the forfeiture; that some act must be done by the trustees, to show what their election is—and, until such election is made, the right of the purchaser to the land, can not be disturbed: that if this election should ultimately be to sue on the bond, although it be after the expiration of the three months, they waive the forfeiture; and that such suit may be brought, and the waiver made, a ter three months: that the title to the land can not be in abeyance; and a different construction would leave it so, until the trustees made their election, or until the expiration of the three months.

It would be no objection to the validity of a sta-

tute, that by the plain letter and manifest intention of it, the title of lands, under certain circumstances, would be not vested, but suspended, or in abeyance. But, it is not a necessary consequence, attending a literal construction of this act, that the title is, at any time in abeyance. The fee simple remains in the trustees, without controversy, until the whole of the purchase money is paid. The title of the purchaser is altogether equitable in its nature, except his mere right of possession. Upon making punctual and full payment, he is entitled to seek a specific performance of the contract, in chancery; and that court would compel the trustees to make a conveyance. His equitable title is forfeited by the breach of the contract on his part; but if the trustees elect to pursue the remedy on the bond, the equitable interest which the purchaser had in the land, revests in him, and is not again divested, until the suit proves ineffectual to produce the money. The trustees have no further option, than the one given in the statute; if they do not sue on the bond in the three months, they cannot sue on it at all. The maxim, "*expressio unius, exclusio alterius*," applies; and unless the suit is brought within the time limited, the bond is discharged, and the land is theirs.

The provision with respect to the failure of a suit to produce the money, strengthens this construction. If a *ca. sa.* is returned *non est*, or a *fi. fa. nulla bona*, the land is forfeited. The judgment and execution can not be continued in force, with the intention of having them satisfied at some future time; the land, which is the subject of the contract, can not be sold, and if it does not discharge the judgment, the rest

of the purchaser's property resorted to, to satisfy the debt; but the land is protected from the execution, and when resorted to, under the law, satisfies the whole judgment.

The whole act proves, that it was intended to give mutual privileges—to the purchaser, that of forfeiting the land, if he found himself unable to pay for it, and thus be released from the debt he had contracted; to the vendors, that of relying upon the forfeiture, or resorting to a suit upon the bonds.

It is objected, that this construction might place the purchaser in most disadvantageous circumstances—that he might have paid all but a small balance, have made valuable improvements, &c.; and might intend, and be prepared to make payment, but be prevented by sickness, high waters, or some other casualty, from doing so; or, might be really unable to pay the balance, which he owed—small when compared with the value of the land; and that, in either of these cases, it would be cruel if Chancery could not afford relief.

But, it should be remembered, that the legislature could always interpose in behalf of one who, from misfortune, or otherwise, merited their assistance.— As that body has shut the purchaser, under all circumstances, out of the courts, which, in cases of ordinary contracts of a similar kind, have the power of doing justice between the parties, it would be always ready to prevent injustice itself.

We do not believe the act of 1824, entitled "an act to confirm the title to sundry purchasers of lands sold by the Trustees of the University of Alabama, and for other purposes," can vary the result of this case.

That act authorises the trustees to waive the benefit of the forfeiture upon payment of the amount of principal and interest then due, at any time before the land is again sold.

The institution of this suit shows, that such payment has not been made, in this case; and we do not think it gives the trustees any power, beyond the express provision.

We are of opinion that the judgment must be affirmed.