[S. F. No. 1439.   Department One.—March 3, 1899.]

In the Matter of the Estate of HERMAN ROYER, Deceased.

UNIVERSITY OF CALIFORNIA—PUBLIC CORPORATION—WILL—VALIDITY OF BEQUEST.—The "University of California" is a public corporation and is recognized by that name in the laws of the state, notwithstanding the requirement that the board of directors shall incorporate under the name of the "Regents of the University of California." A bequest by will to the "University of the State of California," for the purpose of founding a designated professorship, is not invalid, by reason of insufficiently designating a corporation entitled to take.

ID.—RIGHT TO TAKE BY WILL—INTERPRETATION OF STATUTE—EXEMPTION OF SOVEREIGN POWER.—The University of California being formed for educational purposes, is within section 1275 of the Civil Code, permitting corporations formed for said purposes to take by will. The rule of interpretation of statutes that rights and

interests are not to be construed as embracing the sovereign power, unless expressly named or included by necessary implication, has no application to the University of California, which, though a public corporation, is not clothed with any part of the sovereign power of the state.

ID.—PROPORTIONATE SHARE OF ESTATE—SUFFICIENCY OF FUND.—The question whether the bequest exceeds one-third of the estate of the testator, is one of fact, which should be distinctly passed upon. The sufficiency of the fund to accomplish the designated purpose of endowing a chair in the State University, cannot be objected to, where there is no evidence to justify a finding that the gift has failed for that reason.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   J. V. Coffey, Judge.

The facts are stated in the opinion.

John B. Mhoon, for Regents of the University of California, Appellant.

W. F. Williamson, for executors, Respondents.

Joseph Leggett, for heirs, Respondents.

CHIPMAN, C.—The controversy arises upon conflicting petitions for distribution filed by the heirs at law of deceased and by the regents of the University of California, and involves the right to the residue of the estate of deceased under the provisions of his will.   After making certain specific bequests the testator, in the sixth clause of his will, declared as follows: "Sixth: All the rest and residue of my property and estate I do hereby give, devise, and bequeath unto the University of the State of California for the sole purpose of founding a professorship of 'Political Economy,' and for no other purpose whatever.   If the said gift and devise shall for any reason fail, the same shall revert to my next of kin."

The court found that neither the "University of the State of California," nor the "University of California," is now or ever has been a corporation under the laws of this state, and is not a person; and that each is an entity distinct from the "Regents of the University of California," which latter are a corporation duly organized under the laws of the state.   The court also found that the residue of the estate is insufficient for the purpose of

founding a professorship of political economy, and that the gift has failed, and has, by the express provisions of the will, reverted to the next of kin of the testator.

The court denied the petition of the regents of the University of California, and granted that of the heirs at law, and ordered distribution accordingly, from which this appeal was taken.

But little evidence was submitted at the hearing. In addition to the introduction of the will it appeared that on October 12, 1897, appellant adopted a resolution "that the funds devised to the university by Herman Royer, deceased, together with such other funds as are now available for that purpose, or may become available hereafter, in aid of founding a professorship of political economy, be invested so as to produce an income, and that no part of the principal funds so invested shall ever be expended." It was admitted that the regents of the University of California are now and have been since 1868 a duly incorporated and existing corporation under an act of the legislature approved March 23, 1868, and that a chair of political economy of said university was established in 1878 and is now existing. It also appeared that the residue of the estate of deceased amounts to five thousand four hundred and sixty-seven dollars and ten cents. This was all the evidence.

The findings of fact are obviously drawn not only from this evidence but also to some extent from the statutes, and are practically findings of mixed law and fact. They are attacked as against both the law and the evidence. It seems to be admitted that the "University of California" and the "University of the State of California" mean the same entity, whatever that entity may be. We shall therefore disregard any distinction between the two designations, and for brevity will refer to the University of California as "the university," and the regents of the University of California as "the regents."

The questions involved are of much importance, as they concern not only the bequest in issue, but previous gifts and grants as well as the legal status of the university. This must be our apology for entering somewhat fully into the consideration of the matter.

1. The constitution of 1849, article IX, section 4, directed the legislature to take measures for the disposition of such lands

as had then been or might thereafter be granted by the United States, or any person or persons, to this state "for the use of a university," pursuant to which provision the act of March 23, 1868, was passed.    (Stats. 1867-68, p. 248.)    Section 1 of the act reads: "A state university is hereby created. . . . . The said university shall be called the University of California. . . . . The said university shall be under the charge and control of a board of directors, to be known and styled 'The Regents of the University of California.'    The university shall have for its design to provide instruction and complete education in all the departments of science, literature, art, industrial, and professional pursuits and general education," and also various special courses of instruction named in the act.    The act provides for the establishment of different colleges of which the university is to consist. Section 11 provides:  "The general government and superintendence of the university shall vest in a board of regents, to be denominated the 'Regents of the University of California,' who shall become incorporated under the general laws of the state of California by that corporate name and style."    Section 12 provides: "The said board of regents, when so incorporated, shall have the custody of the books, records, buildings, and all other property of the university."    This section also provides for vesting the title of certain property in the state where donated for the purpose of the university, and also provides how the regents shall dispose of property donated or conveyed to them; and also for the affiliation of certain colleges with the university, in which case the regents are to have no right of property in or over the same, but "such college so affiliated may retain its own property," et cetera.    Section 13 gives the regents, when incorporated, power "to enact laws for the government of the university, to elect a president of the university and the requisite number of professors, instructors, officers, and employees, and to fix their salaries, also the term of office of each, and to determine the moral and educational qualification of applicants for admission to the various courses of instruction."    Section 14 speaks of the income of the university and when the regents may provide for free tuition.    Section 15 makes the president of the university "the president of the several faculties and the executive head of the institution in all its departments, except as herein otherwise

provided." This section also provides for the selection of a secretary and a treasurer of the university. Section 20 provides "for the endowment and support of the university and its buildings and improvements"; then follows a designation of the various funds or income arising out of the sales of lands granted to the state by Congress. Some of these funds are to be paid over to the regents; in other cases to the state treasury "and paid over to the treasurer of the university, for the use and behoof of the said university and expended by said board," et cetera. The section also appropriates contributions to the endowment appropriated by the state "or from public or private bounty." The income of these funds is placed at the disposal of the regents "for the support of the university and of the several colleges and schools thereof," et cetera. The section also gives the regents authority to appoint persons "to solicit and collect private contributions for the endowment of the university," et cetera. Section 21 provides "for the current expenditures of the university, and payment is to be made by warrants of the president of the board drawn upon the treasurer of the university." Section 23 refers to the buildings of the university, and section 24 provides that "the collections by the state geological survey shall belong to the university," and directs that they be arranged in a building denominated the "Museum of the University." Section 25 directs the regents to construct "such buildings as shall be needed for the immediate use of the university," and to take steps for the improvements of its grounds, et cetera. The general appropriation act of March 30, 1868 (Stats. 1867-68, p. 583), appropriated two hundred thousand dollars of the moneys derived from the sale of overflowed or tide lands, "which shall be paid into the university fund, and paid out therefrom to the regents of the university upon their order, to be by them expended for university purposes as provided by law." The various land grants of the government in aid of the university made necessary a "land agent of the university," and such officer is frequently mentioned in the acts of the legislature (Pol. Code, sec. 3534; Act March 13, 1874; Stats. 1873-74, p. 356), who is authorized to select state land and "issue certificates of purchase and patents." When the act of 1868 was codified and brought into the Political Code, sections 1385 et seq., the university was

treated as an institution of the state having its location in Alameda county; the "endowment" is to the university (Pol. Code, sec. 1415); an academic senate of the university is created (Pol. Code, sec. 1461); by the act of March 19, 1878, certain funds were consolidated to be known as the "Consolidated Perpetual Endowment Fund of the University of California," and all interest, et cetera, arising out of the same "shall be placed in the general fund of the university and subject to disbursement to meet the current annual expenses of the University of California." Throughout the entire legislation of the state the university is spoken of as having some sort of an existence, a part of which, rather than distinct from it, are the regents. The latter seem to be a corporation formed in aid of the objects and purposes of the university, but not to displace nor destroy nor to absorb its entity.

Acts are found "for the endowment of the university." (Stats. 1869-70, p. 668); "for the support of the university" (Stats. 1871-72, p. 554); "concerning university lands" (Stats. 1873-74, p. 356). General appropriations run in the same way: "For the aid of the state university, eighty thousand dollars" (Stats. 1873-74, p. 902); "to reimburse the University of California" (Stats. 1881, p. 50).

The constitution of 1879, article IX, section 9, declares: "The University of California shall constitute a public trust, and its organization and government shall be perpetually continued in the form and character prescribed in the organic act creating the same passed March 23, 1868 (and the several acts amendatory thereof)," et cetera. It is the university organized by the act of 1868, and not the regents—one of its constituent parts—which the constitution declares to be a public trust. In *Foltz v. Hoge*, 54 Cal. 28, and *People v. Kewen*, 69 Cal. 215, where the status of the Hastings College of Law as an affiliated college of the university was considered, this court seems to have treated the university as a state institution to which a college might be attached under the organic act of 1868. Looking to the origin and purposes of the university and the constitution and legislation respecting it, we cannot doubt its existence as an entity capable of taking by bequest. It is a governmental agency created by the law-making power and endowed with very important

functions, which it has been exercising for a long period of years. It may be unique, but it is nevertheless an instrumentality of the state created by the legislature acting within its just powers. That the regents are by law made the governing body of the university, and are required to incorporate under the laws of the state, is by no means inconsistent with the continued existence of the university as a public corporation; and the fact that the organic act in terms provides that grants and gifts may be made to the regents and to the state, and does not provide in terms that grants and gifts may be made to the university, does not, in our opinion, indicate that it was intended that the university was to be incapable of taking by gift, grant, or bequest. The organic act leaves the property of the university with it, and only gives to the regents the custody and control of it.

Mr. Justice Story, in *Dartmouth College v. Woodward*, 4 Wheat. 563, said: "Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes and counties; and in many respects they are so, although they involve some private interest; but, strictly speaking, public corporations are such only as are founded by the government for public purposes where the whole interests belong also to the government. . . . . For instance, a bank created by the government for its own uses, whose stock is exclusively owned by the government, is, in the strictest sense, a public corporation. So a hospital created and endowed by the government for general charity"; and, he adds, that the reasoning by which private and public corporations are distinguished applies in its full force to eleemosynary corporations such as colleges and hospitals. Mr. Morawetz describes the difference between private and public corporations as radical, the former being associations formed by voluntary agreement of their members, while of the latter he says they "are not voluntary associations at all, and there is no contractual relation between the corporators who compose them; they are merely governmental institutions created by law for the administration of the affairs of the community." (Morawetz on Corporations, 2d ed., sec. 3.) To corporations proper authors and courts have added a species called *quasi* corporations, or corporations *sub modo*, i. e., associations and government institutions possessing only a portion of the attributes which distinguish or-

dinary public or private corporations. (Morawetz on Corporations, sec. 6; 2 Kent's Commentaries, 274.) These *quasi* corporations may be either public or private, and are to be distinguished upon the same principle as ordinary corporations.

It would seem clear enough that the university comes plainly within the commonly accepted definition of a public corporation. It was founded by the state; its original and primary endowment was by the United States by grant to the state for this special purpose; all its property is property of the state; it was created by the state and is subject to the laws of the state as a state institution within the limits of the new constitution, which has declared it to be a public trust, and that its organization and government shall be perpetually continued in the form and character prescribed by the organic act. This latter act is the charter of the university. In many respects it is modeled after the Dartmouth College charter. But in the Dartmouth College charter all doubt was removed as to what constituted the corporate body by the terms of the charter itself, in which the trustees were made the body corporate "by the name of the Trustees of Dartmouth College," and the letters patent were to the trustees. (*Dartmouth College v. Woodward, supra.*) In the present case the law created the university, and, while it provided for a governing body called regents, it did not create or designate them as the body corporate as the charter created the trustees of Dartmouth College. The university was created first, and the trustees became incorporated afterward, as was directed in the organic act. But the act nowhere provides in terms or by implication that when incorporated the regents should become and thereafter be the university.

Respondent's counsel seems to think it an absurdity to suppose that it was intended by the legislature to give any sort of corporate existence to an institution officered only by a president, treasurer, secretary, and land agent. It is altogether too narrow a view of the university to say that it is composed only of these officers. The organic act declares that it shall consist of various colleges of arts, letters, and such other professional and other colleges as may be added thereto or connected therewith. Included in these are colleges of agriculture, mechanic arts, mines, civil engineering, medicine and law. The property previously

belonging to the College of California (now the site of the university) was conveyed to the state "for the benefit of the state university," and said college was to go out of existence "as soon as the state shall organize the university." The regents are in fact a part of the university, with specifically defined powers in their custody and control of the property and the management of university affairs. The act designates them "The Regents of the University of California." It may seem anomalous that the law should require the regents to incorporate, or that we should have apparently a corporation within a corporation, but the legislature created the university upon that plan, and, however novel it may be, the power existed in the legislature not only to create the university but to prescribe the mode and manner of the exercise of its functions.

I can conceive of no imperative necessity for the requirement that the regents should incorporate, but that it was so required did not change their relation to the university; it only endowed the regents with certain corporate powers and prescribed the mode and manner by which they were to exercise the control given them over the affairs of the university. They have no duties or powers beyond the purpose of their creation, which was to take the custody and control of the university property and to perform certain prescribed duties in the management of the university. The law intrusts "the immediate government and discipline of the several colleges" to their respective faculties, "to consist of the president and the resident professors of the same." These faculties are part of the university and not of the regents. All endowments are to the university, and all funds, whether coming directly to the regents, to the state, or to the university, are for the benefit of the university. Indeed, the central idea of the law was to create and organize a state university upon broad lines of expanding usefulness. How this university, when created, was to be managed and controlled—the machinery to be provided in its organization for the purpose of practically carrying out the design—was for the legislature to determine. I cannot regard the regents as a legal corporate entity, except as a part of and ancillary to the parent and principal institution—the public corporation created by law as such and entitled "The University of California." It cannot be

doubted that a legislative appropriation to the university would be a legal appropriation available and enforceable; and, if it is capable of taking by appropriation in that name, it is capable of taking by grant or bequest. A recent and important appropriation to the university is found in the act of February 27, 1897. (Stats. 1897, p. 44.) It provides that: "In addition to all other sources and means of support .... of the University of California, there is hereby levied, annually, .... an 'ad valorem' tax of one cent on each one hundred dollars of value of the taxable property of the state .... for the use and support of the University of California." (Stats. 1897, p. 44, sec. 1.) This money must be paid into the state treasury and "converted into the state university fund" (Stats. 1897, p. 44, sec. 3); and "must be applied only for the uses and purposes of the University of California." (Stats. 1897, p. 44, sec. 5.) This money may be drawn out upon the order of the board of regents, but when paid out by the state treasurer it must be made "payable to the order of the treasurer of the University of California, out of said 'state university fund.'" (Stats. 1897, p. 44, sec. 4.) This is clearly an appropriation of money to and for the uses of the university, and it goes from the state into the hands of the treasurer of the university, and to our minds is an unmistakable legislative recognition of the public corporation created by the act of 1868, called "The University of California."

I have examined the reported cases decided by several states and territories of the Union where the Congressional grant has been taken advantage of, and institutions similar to the University of California have been created. These institutions differ in some respects from each other in the machinery of their organization, and in none of them do I find an exact parallel with the university of this state. But everywhere the courts have held them to be public corporations. (*University v. Winston*, 5 Stew. & P. 25; *University of North Carolina v. Maultsby*, 2 Jones Eq. 241; *State v. Knowles*, 16 Fla. 577; *State ex rel. Little v. Regents*, 55 Kan. 389; *Oklahoma etc. College v. Willis*, 6 Okl. 593; *Dunn v. University*, 9 Or. 357.) The Oklahoma court said: "It seemingly needs no argument to show that the public educational institutions of a state are as much a part of its sovereignty as are its counties." In speaking of the university of that state

the Oregon court said: "It is true the legislature has not declared it to be a corporation in express terms, but this was not essential"; and so the Kansas court spoke of the university "as a public corporation created to carry on special work 'for the benefit of the state or the public interest."

2. Respondents contend: 1. That the university not being expressly authorized by section 1275 of the Civil Code, it cannot take by will; and 2. Even if it could take, the bequest, being in its nature charitable, must not exceed one-third of the distributable estate under section 1313 of the Civil Code. The university, as we have seen, is a public corporation "formed for scientific, literary, or solely educational purposes," and if the statute includes such a corporation at all, it is by its terms capable of taking by will. (*Estate of Bulmer*, 59 Cal. 131.) Appellant contends that section 1313 does not apply, because it is a general rule in the interpretation of statutes limiting rights and interests not to construe them to embrace the sovereign power or government unless the same be expressly named therein or intended by necessary implication. (Citing 1 Kent's Commentaries, 460; *United States v. Hoar*, 2 Mason, 311; 26 Fed. Cas. 330; *Mayrhofer v. Board of Education*, 89 Cal. 110; 23 Am. St. Rep. 451; Bishop on Written Laws, secs. 103, 142; Sedgwick on Statutory Construction, 395.)

There is nothing in the record from which we can determine whether the residue of the estate "exceeds one-third of the estate of the testator." There is no finding on this question of fact. As it will arise hereafter, however, the law governing the point should be stated. We do not think the principle upon which appellant relies should govern in this case. The university, while a governmental institution and an instrumentality of the state, is not clothed with the sovereignty of the state and is not the sovereign. As we understand the rule, it is only the sovereign that is exempt from the operation of statutes affecting its interest or rights. We think the statute applies to the university as a public corporation.

3. Respondents contend that the bequest has failed because the fund is inadequate to carry out the testator's original intent, and that the court has so found the fact upon sufficient evidence. The only evidence claimed by respondents to support this find-

ing is the resolution of the regents.  We cannot see that this resolution, which directs the investment of the fund bequeathed by deceased, indicates its insufficiency.  It was admitted that there was a chair of political economy of the university established in 1878, and now existing.  Nor can we say that the residue (five thousand four hundred and sixty-seven dollars and ten cents) is necessarily insufficient for the purpose intended by the testator.

Section 1317 of the Civil Code provides that where the intention of the testator "cannot have effect to its full extent, it must have effect as far as possible."  Conceding that the probate court could nullify the bequest on the ground of inadequacy alone, there is no evidence to justify a finding that the gift has failed for this reason.

The decree should be reversed.

Haynes, C., and Gray, C., concurred.

For the reasons given in the foregoing opinion the decree is reversed.           Harrison, J., Garoutte, J., Van Dyke, J.