[Civ. No. 17686. First Dist., Div. Two. May 20, 1958.]

BEN NEWMARKER et al., Appellants, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (a Corporation), Respondent.

Smith & Parrish for Appellants.

James H. Phillips, as Amicus Curiae on behalf of Appellants.

Thomas J. Cunningham, John P. Sparrow and John E. Landon for Respondent.

KAUFMAN, P. J.—Plaintiffs, who are employees of the defendants, filed a complaint for declaratory relief to determine their rights to sick leave accrued before July 1, 1954. Both sides waived a jury trial. The court made findings of fact that the plaintiffs were not entitled to any sick leave and that all accrued sick leave accumulated by the plaintiffs up to July 1, 1954, was cancelled on that date, and entered judgment in favor of the defendants. Plaintiffs' motion for a new trial was denied, and this appeal from the judgment ensued.

The chronology of events leading to the controversy is as follows: On June 30, 1954, all of the plaintiffs were employed at the University of California in Berkeley, as full time Build-

ing and Construction Trades employees. Under the wage policy of the defendants in effect at that time, all of the plaintiffs were paid the prevailing construction wages paid by private employers in Alameda County for comparable services, excluding social security and unemployment insurance benefits, but including the monetary equivalent of health and welfare fringe benefits, and nonacademic university personnel benefits such as vacation and sick leave. It was stipulated that under the rules issued by the president of the university pursuant to the authority granted to him by the standing orders of the defendants, the governing body of the university, the right to draw on accrued sick leave during periods of injury or illness was lost on termination of employment. As of June 30, 1954, the plaintiffs had accumulated unused sick leave as follows:

Plaintiff Ben Newmarker ..................58 days
 " Benjamin F. Tibbetts ............24½ "
 " James J. Harrison ...............40½ "
 " Frank Barone ....................16 "
 " Robert Croke ....................16 "

Plaintiffs were members of craft unions affiliated with the Building and Construction Trades Council of Alameda County, hereinafter referred to as the Council. For six months during the winter of 1953-54, Mr. Childers, the business representative of the Council and a committee of the Council met with Mr. Corley, the university vice-president in charge of business affairs, to discuss the wages and working conditions of the university building trades employees. The parties stipulated that Mr. Childers and Mr. Corley represented them at all relevant times. As result of a request for an increase in wages by the Council, the defendants examined and studied their wage and working condition policies in the entire field. They found that university building trades employees were receiving wages and benefits which were 11 per cent higher than those paid by private industry for comparable services. Mr. Childers stated that private industry union contracts did not include sick leave benefits. On June 25, 1954, in order to equalize their wage policies with that of private industry, the defendants at a meeting in Los Angeles, adopted the following new wage policy applicable to the plaintiffs as of July 1, 1954:

"1) That for those building trades on the Berkeley, Los Angeles, and San Francisco campuses, subject to construction and/or maintenance rates of pay, there be established effective July 1, 1954, the following policies:

"a) For all employees on the rolls as of June 30, 1954, the present University wage policies shall continue, but without increase until such rates are surpassed by rates of personnel recruited after June 30, 1954.

"b) For all new employees a rate of pay shall be computed from the area craft base construction prevailing rate (exclusive of health and welfare and other union fringe benefits) less 11% but inclusive of regular University fringe benefits."

The University of California building trades employees at the Richmond Field Station and at the Los Angeles campus accepted the above 11 per cent ruling. Mr. Childers knew of the proposed wage policy change before June 25th and had registered the opposition of the Alameda County Building and Trades Council in a letter to the defendants dated June 7th and requested that the Alameda Council be permitted to present oral arguments at the June 25th meeting. Pursuant to this request Mr. Childers and some members of the union committee were present at the June 25th meeting of the defendants in Los Angeles. There, Mr. Childers again stated that the general concept of the proposal was not acceptable to the men he represented. On June 26th the above quoted resolution was presented to Mr. Childers who reiterated his opposition. Mr. Childers and Mr. Corley met several times in order to work out a program acceptable to both sides. In protest against the June 25th resolution, the Alameda Council called a strike effective July 1, 1954. Plaintiffs and some 450 union employees of the university in the area participated in the strike. At first, there was a complete shut-down, but after conferences with the union, certain essential university operations were restored to service.

On July 6, 1954, the regents held another meeting and adopted the following wage policy resolution applicable to the plaintiffs:

"(a) That effective July 1, 1954, all Building Trades employees of the Berkeley campus of the University, the San Francisco campus of the University, and the Richmond Field Station of the University, be paid the prevailing wages of the various crafts, and in addition to be granted the prevailing working conditions (except as limited by existing laws) in each craft, including health and welfare. It is to be understood that University personnel benefits shall be withdrawn.

"(b) That health and welfare not be recognized as such, but the cash equivalent be paid to the employees as a part of

wages for all employees of all organized groups that have established it as prevailing practice.

"Nothing in this resolution in any way constitutes an admission by the Regents of the right of any group to picket the University of California or any of its campuses or activities."

On the evening of July 6th, Mr. Corley discussed the above quoted resolution with Mr. Childers. Mr. Childers admitted that Mr. Corley explained to him that the vacation pay accrued until June 30th would be paid, but that the accrued sick leave would be cancelled. Mr. Childers further testified that when he indicated that the proposal would never be accepted by the employees, Mr. Corley indicated that the matter of the accrued sick leave was open to further negotiation. Mr. Corley denied making the latter statement and testified that he told Mr. Childers that he was limited to offer the terms of either the June 25th or the July 6th resolution. At a meeting on the afternoon of July 7th, the July 6th proposal was again discussed by Mr. Corley, Mr. Childers, Mr. Ash, the Secretary of the Oakland Trades Council and Mr. Bartalini, a member of the Union's committee. Mr. Bartalini testified that he clearly understood that the July 6th resolution wiped out accumulated sick leave. On July 7, 1954, at a meeting of the Building Trades employees, attended by the plaintiffs, Mr. Childers stated that sick leave and vacation benefits would be cancelled after July 1, but that accrued vacation would be paid and that the matter of accrued sick leave had been left open for negotiation. On July 8, 1954, the building trades employees returned to work. The trial court found that when the plaintiffs returned to work on July 8th they were aware that the defendant had cancelled accrued sick leave privilege and that the plaintiffs returned to work pursuant to the wage policy announced by the defendants on July 6th. From July 7, 1954, until the filing of this action in August 1955, Mr. Childers did not again approach Mr. Corley about the matter of the accrued sick leave.

During the following year, the plaintiffs were absent from work as follows: plaintiff Newmarker for 14⅝ days from December 27, 1954 to January 17, 1955, because of an industrial accident; plaintiff Tibbetts for 23 days from January 4, 1955 to February 4, 1955, because of an ulcer and hemorrhoids operation; plaintiff Harrison for 11 days from October 15, 1954 to November 1, 1954, because of stomach ulcers; plaintiff Barone for 17½ days from April 27, 1955 to May 23,

1955, because of a hernia operation; and plaintiff Croke for 13 days from May 4, 1955 to May 23, 1955, because of an appendectomy. Each of the plaintiffs applied for sick leave for the above mentioned periods of time. The defendant denied all of the applications on the basis of the July 6th resolution. This denial is the substance of this action.

On appeal, plaintiffs contend that they are the employees of a private corporation; that they cannot be deprived of their vested right to sick leave which is a part of their contract of employment; that even if the defendants are a public body, the attempt to deprive them of accrued sick leave is unconstitutional as an impairment of the obligation of contracts and a violation of the equal protection clauses of the state and federal Constitutions, as well as of Government Code, sections 18100 and 18105; that the resolution of July 6th was ambiguous and *ultra vires*; that their strike was not illegal and did not, even if illegal, terminate their employment relationship with the defendants.

Plaintiffs' chief authority for their argument that the defendants are a private corporation is 20 Opinions Attorney General 229, which stated only that a superior court judge may be a member of the board of regents as such status is not "other office or public employment" prohibited by article VI, section 18 of the state Constitution. While the judicial pronouncements as to the nature of the Board of Regents as a public body are not completely consistent (*Lundy* v. *Delmas*, 104 Cal. 655 [38 P. 445, 26 L.R.A. 651]; *Estate of Royer*, 123 Cal. 614 [56 P. 461, 44 L.R.A. 364]; *City Street Imp. Co.* v. *University of Calif.*, 153 Cal. 776 [96 P. 801, 18 L.R.A. N.S. 451]; *Caminetti* v. *Pacific Mutual L. Ins. Co.*, 22 Cal.2d 344 [139 P.2d 908]; *Raisch* v. *University of Calif.*, 37 Cal.App. 697 [174 P. 943]), common sense and the weight of authority indicate that the board of regents is a public legal entity charged with the government of a public trust. (Cal. Const., art. IX, § 9; Organic Act, Stats. 1867-8, ch. CCXLIV, § 1, p. 248; *Williams* v. *Wheeler*, 23 Cal.App. 619 [138 P. 937]; *Davie* v. *University of Calif.*, 66 Cal.App. 693 [227 P. 247]; *People* v. *San Francisco*, 77 Cal. 136 [19 P. 257]; *Estate of Purington*, 199 Cal. 661 [250 P. 657]; *Pennington* v. *Bonelli*, 15 Cal.App.2d 316 [59 P.2d 448]; *Wall* v. *University of Calif.*, 38 Cal.App.2d 698 [102 P.2d 533]; *Webster* v. *University of Calif.*, 163 Cal. 705 [126 P. 974]; *Fraser* v. *University of Calif.*, 39 Cal.2d 717 [249 P.2d 283]; *Hamilton* v. *University of Calif.*, 293 U.S. 245 [55 S.Ct. 197, 79 L.Ed. 343]; *Estate*

646

*of Munson*, 54 Cal.App.2d 590 [129 P.2d 420]; 1 Fletcher, Cyclopedia of Private Corporations (1933), ch. 3, § 58, pp. 195-203.)

■ In this state as elsewhere, a strike against a public entity is unlawful. (*City of Los Angeles* v. *Los Angeles Bldg. & Const. Tr. Council*, 94 Cal.App.2d 36 [210 P.2d 305]; *City of Manchester* v. *Manchester Teachers Guild*, 100 N.H. 507 [131 A.2d 59]; *Norwalk Teachers' Assn.* v. *Board of Education*, 138 Conn. 269 [83 A.2d 482, 31 A.L.R.2d 1133]; Anno.: 31 A.L.R.2d 1142 and cases cited therein.) ■ As pointed out in the Los Angeles case, *supra*, at page 48: ''All the cited cases either expressly or implicitly acknowledge that to the extent that the terms and conditions of public employment are governed by statute or charter, they are not subject to modification by contract, and concerted labor activity instigated for the purpose of affecting such terms and conditions is not sanctioned by the law.'' Here, the terms and conditions of plaintiffs' employment were set by the Rules of the President of the University, issued pursuant to the standing orders of the defendants, who under article IX, section 9 of the state Constitution have been given ''full powers of organization and government, subject only to such legislative control as may be necessary to insure compliance with the terms of the endowments of the university and the security of its funds.'' Plaintiffs have not shown that the defendants' resolutions of June 25th and July 6th, which sought to bring the rates of compensation in harmony with the prevailing rates in private industry were so fraudulent or palpably unreasonable as to indicate an abuse of discretion as a matter of law. (*Parker* v. *Bowron*, 40 Cal.2d 344 at 363 [254 P.2d 6].) If the plaintiffs are unhappy about the amount of discretion and power in the matter of wage policy given to the defendants, and the fact that their conditions of employment are not protected by existing statutes, as well as the fact that as public employees they do not have the same rights to strike and to bargain collectively (*State* v. *Brotherhood of R. R. Trainmen*, 37 Cal.2d 412 [232 P.2d 857]) as their counterparts in private industry, plaintiffs' remedy lies with the Legislature, not with the courts.

■ Plaintiffs also contend that even as public employees their strike did not terminate their employment relationship with the defendants. Plaintiffs rely on *Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744 [151 P.2d 229, 154 A.L.R. 1081]. That case, however, dealt with a collective bar-

gaining agreement made with a private employer. ▉ Labor Code, section 923, which declares this state's policy in favor of collective bargaining does not apply to public employment. (*Nutter* v. *Santa Monica,* 74 Cal.App.2d 292 [168 P.2d 741].)

▉ The common-law rule which applies here is that a strike terminates the employment relationship. (*Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 P. 324].) The parties stipulated that under the university rules in effect on June 30, 1954, rights to accrued sick leave are lost on termination of employment.

▉ As we have concluded above that the lower court correctly found that plaintiffs' rights to accrued sick leave were terminated with the strike of July 1st it is not necessary to discuss at length plaintiffs' argument that sick leave is a part of the bargained for "wage" and thus a right which vests at the beginning of service, which cannot be retroactively and unilaterally withdrawn. We need to note only that in this state the fundamental difference between sick leave and vacation pay has long been recognized. In *Adams* v. *City & County of San Francisco,* 94 Cal.App.2d 586 [211 P.2d 368, 212 P.2d 272], this court said at pages 596 and 597, "Overtime pay is for actual work performed which is definitely ascertainable as to time and amount. Holiday and vacation pay cover certain designated periods and may be ascertained as definitely as regular daily or hourly pay. The sick leave, in fact, may not be used for a number of years, or it may or may not be taken for a longer period than two weeks, subject to the period of accumulation. Payment for sick leave is too indefinite to form the basis of 'rate of pay' though the real distinction may rest upon the fact that it is welfare pay. Sick leave or disability leave pay is not a gratuity. There is no vested right to such compensation until the happening of the contingency. . . ." In *Hatch* v. *Ward,* 27 Cal.2d 883 [168 P.2d 22], the Supreme Court recognized the propriety of an amendment to the rules of the State Personnel Board which reduced from 100 days to five, the amount of sick leave pay a state civil service employee could draw for a particular purpose. In 1955, the attorney general of this state ruled that a state civil service employee who had been laid off was not entitled to be paid for the sick leave theretofore accumulated, noting that in this respect sick leave differs from unused vacation. (26 Ops. Atty. Gen. 107.)

▉ Nor is there any merit to plaintiffs' argument that if sick leave is not a vested right, it is a gratuity which would

amount to a gift of public monies in violation of article IV, section 31 of the state Constitution. In the first place it is questionable whether article IV, section 31, is applicable to the defendants. (*Cf.* 3 Ops. Atty. Gen. 42, where art. IV, § 32, prohibiting extra compensation was found inapplicable to the defendants, who are an independent constitutional agency created pursuant to art. IX, § 9.) In the second place, even if applicable, sick leave would probably come within the public purpose exception to article IV, section 31. (*Allied Architects' Assn.* v. *Payne,* 192 Cal. 431 [221 P. 209, 30 A.L.R. 1029] ; *California Employment Stabilization Com.* v. *Payne,* 31 Cal.2d 210 [187 P.2d 702] ; 23 Ops. Atty. Gen. 271.)

We need not concern ourselves with the plaintiffs' other contentions as to the unconstitutionality of the resolution of July 6th as this matter was not duly raised below. (*Hershey* v. *Reclamation District,* 200 Cal. 550 [254 P. 542].) ▮ As to Government Code, sections 18100-18105, plaintiffs, relying on *Tolman* v. *Underhill,* 39 Cal.2d 708 [249 P.2d 280], argue that by this statute the Legislature has undertaken to exclusively occupy the field of sick leave for state employees. However, in that case, the court also said at page 712:

"Determination of the question of whether the Legislature has undertaken to occupy exclusively a given field depends upon an analysis of the statute and the consideration of the facts and circumstances upon which it was intended to operate."

A brief examination of the statute militates against the plaintiffs' position. Government Code, section 18100 and following, provide for sick leave for all state officers and employees under rules prescribed by the State Personnel Board. Section 18105 impowers the appointing power of any officer or employee not a member of the State Civil Service to administer sick leave in accordance with the rules of the State Personnel Board. The State Personnel Board does not determine the employment policies of the defendants who have been given full powers to govern the University by article IX, section 9 of the state Constitution. (2 Ops. Atty. Gen. 143.) Nor can it be argued that the employment and wage conditions of University employees at different campuses is a matter of general statewide concern like the loyalty of teachers at the university. (*Tolman* v. *Underhill, supra.*) In order to bring plaintiffs within the State Employees Retirement System, they and the defendants are specifically mentioned in Government Code, sections 20008, 20011, 20012, 20013, 20014,

20015, etc. Furthermore, Government Code, section 18101.5, adopted in 1951, which makes a special provision for sick leave credits for former university employees who subsequently enter service, appears to indicate that the Legislature did not intend that sections 18100-18105 apply to institutions governed by the defendants. As we indicated above, if the plaintiffs seek to question the wisdom of this policy, their remedy lies with the Legislature, not with the courts.

Plaintiffs next contend that the defendants' resolution of July 6, 1954, was not passed in accordance with the corporate by-laws which provide for notice of meetings and the affirmative vote of thirteen members of the board to amend standing orders. The stipulation of facts, plaintiffs' Exhibit 1, paragraph 11 states that the July 6th resolution was "duly and regularly passed and adopted" by the defendants. This issue, also, was not raised below and need not detain us further here.

Plaintiffs' next argument is that even if validly adopted, the July 6th resolution is ambiguous and does not show a clear intention to abolish accumulated sick leave. The resolution of July 6th provided that, effective July 1st, "It is to be understood that all University Personnel benefits shall be withdrawn." The meaning of this proposal was explained as follows according to the minutes: "The effect of the above would be to pay contract (construction) wages, to grant contract working conditions, including health and welfare, but excluding social security and unemployment insurance, and to withdraw from all building trades employees, old and new, university benefits except State Employees' Retirement System benefits, which under the law must be continued. Except for vacations as of June 30, 1954, all holiday, sick leave and vacation with pay would be cancelled." The record indicates that the same explanation was made to Mr. Childers on the evening of July 6th. The trial court found that when plaintiffs resumed employment on July 8th, they were aware that the defendants had cancelled accumulated sick leave. The only evidence in the record relating to the question of whether the matter was open to further negotiations is conflicting. There is uncontroverted evidence in the record showing that after July 7th, Mr. Childers made no efforts to further negotiate the issue of accumulated sick leave. We must resolve all reasonable inferences from the evidence in favor of the conclusion reached below. We therefore conclude that there is no merit in plaintiffs' arguments on this issue.

In view of the foregoing we conclude that the judgment finds ample support in the record before us.

Judgment affirmed.

Dooling, J., and Draper, J., concurred.

A petition for a rehearing was denied June 19, 1958.