OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

|                               |     |                |
|-------------------------------|-----|----------------|
| OPINION                       | :   | No. 89-402     |
| of                            | :   |                |
|                               | :   | JULY 6, 1989   |
| JOHN K. VAN DE KAMP           | :   |                |
| Attorney General              | :   |                |
|                               | :   |                |
| RODNEY O. LILYQUIST           | :   |                |
| Deputy Attorney General       | :   |                |
|                               | :   |                |

---

THE CALIFORNIA STATE BOARD OF PHARMACY has requested an opinion on the following question:

Is a pharmacy operated by the University of California subject to the licensure, inspection, and disciplinary provisions of the Pharmacy Law?

CONCLUSION

A pharmacy operated by the University of California is subject to the licensure, inspection, and disciplinary provisions of the Pharmacy Law.

ANALYSIS

The University of California ("University") was founded in 1868 and is established under the Constitution as "a public trust, to be administered by . . . 'The Regents of the University of California.'" (Cal. Const., art. IX, § 9, subd. (a).) "Broadly stated, the function of the University is to impart learning and to advance the boundaries of knowledge." (*Goldberg* v. *Regents of the University of California* (1967) 245 Cal.App.2d 867, 869.) In managing the affairs of the University, the Regents[1] provide students with various health care services, including the operation of such facilities as hospitals and pharmacies. (See *Davie* v. *Board of Regents* (1924) 66 Cal.App. 693, 700-701 [infirmary maintained for "purpose of safeguarding and protecting the health of the student body. . . . maintenance of the health of the students is an educational activity."].)

---

1. The Regents, as specified in the Constitution, are responsible for administering the University's affairs and constitute a separate but constituent part of the University. (*Estate of Royer* (1899) 123 Cal. 614, 619-624.) "The Board of Regents has been variously characterized as an institution of the state, a public corporation, a governmental agency, and a public entity." (*Regents of University of California* v. *Superior Court* (1970) 3 Cal.3d 529, 534.) For our purposes the Regents and the University may be treated interchangeably.

1. 89-402

The question presented for resolution is whether the pharmacies operated on the University's campuses are subject to the provisions of the Pharmacy Law (Bus. & Prof. Code, §§ 4000-4480),[2] particularly with respect to licensure, inspection, and disciplinary proceedings.  We conclude that the requirements of the Pharmacy Law are applicable to the University's pharmacies.

The Pharmacy Law is administered by the California State Board of Pharmacy ("Board") and covers a variety of subjects, including access to areas where dangerous drugs are stored (§ 4035.2), filling prescriptions with generic substitutes (§ 4076.6), labeling drugs furnished (§ 4048), refilling prescriptions (§ 4229), maintaining drug inventory records (§ 4232), and maintaining prescription records (§ 4331).

With respect to the licensing of pharmacies, section 4080 provides:

"No person shall conduct a pharmacy . . . in the State of California unless he or she has obtained a certificate, license, permit or registration from the board.  A certificate, license, permit or registration shall be required for each of the premises of any person operating a pharmacy in more than one location.  Such certificate, license, permit or registration shall be renewed annually on or before November 1 of each year and shall not be transferable."

Additionally section 4391 states:

"No building shall have upon it or displayed within it or affixed to or used in connection with it a sign bearing the word or words . . . 'Pharmacy,' . . . 'Drugstore,' . . . or any word or words of similar or like import . . . unless there is upon or within the building a pharmacy holding a permit issued by the board pursuant to Section 4080 of this code."

Concerning the inspection of pharmacies, section 4010 provides in part:

" . . . The members of the board and inspectors of pharmacy . . . may inspect, during business hours, all pharmacies . . . or places in which drugs are compounded, dispensed or sold."

Under the disciplinary provisions of the Pharmacy Law, the Board may suspend or revoke any certificate, license, permit, registration, or exemption issued by it. (§§ 490, 4350-4359; *Arenstein* v. *State Board of Pharmacy* (1968) 265 Cal.App.2d 179, 192-194.)  In *Vermont & 110th Medical Arts Pharmacy* v. *Board of Pharmacy* (1981) 125 Cal.App.3d 19, for example, the court upheld the Board's revocation of a pharmacy permit and of the licenses of pharmacists for violating the Pharmacy Law, the California Uniform Controlled Substances Act (Health and Saf. Code, §§ 11000-11650), and the Controlled Substances Act (21 U.S.C. § 801; 21 C.F.R. § 1306).[3]

---

2.  All references hereafter to the Business and Professions Code are by section number only.

3.  We note that an investigation by the Board may also uncover violations of the Sherman Food, Drug and Cosmetic Law (Health & Saf. Code, §§ 26000-26851) and of the Board's own administrative regulations (Cal Code of Regs., tit. 16, §§ 1700-1792) implementing the Pharmacy Law.  With respect to operating a pharmacy, the Board's regulations cover such subjects as building construction standards, sanitary standards, security standards, reporting drug losses, and handling radioactive drugs.

For purposes of the Pharmacy Law, "person" is defined in section 4039 as follows:

"'Person' includes firm, association, partnership, corporation, state governmental agency, or political subdivision."

We believe the University comes within this broad statutory definition of "person." (See *Regents of University of California* v. *Superior Court* (1976) 17 Cal.3d 533, 536 ["The University is a public corporation"]; *Estate of Royer*, *supra*, 123 Cal. 614, 619-620 [the University "is a governmental agency . . . an instrumentality of the state"]; *California State Employees Assn.* v. *State of California* (1973) 32 Cal.App.3d 103, 109 ["The University is a constitutional department or function of the state government"]; *Ishimatsu* v. *Regents of University of California* (1968) 266 Cal.App.2d 854, 864 ["the University is a statewide administrative agency"]; *Pennington* v. *Bonelli* (1936) 15 Cal.App.2d 316, 321 ["the University of California [is] a branch of the state"].)[4]

Looking only at the provisions of the Pharmacy Law, we would conclude that the University is required to obtain a license to operate each of its pharmacies (§§ 4039, 4080, 4081), each pharmacy must be managed by a registered pharmacist (§§ 4386-4387; *In re Gray* (1929) 206 Cal. 497, 499-502; see also §§ 4035.2, 4050, 4385), the Board could inspect the University's pharmacies (§ 4010), and the disciplinary provisions (§§ 490, 4350-4359) would be applicable with respect to the operation of each pharmacy.

The critical issue, however, is not whether the University's pharmacies come within language and terms of the Pharmacy Law, but whether the Legislature has the power to regulate the University's pharmacies at all. The issue arises because of the Regents' unique constitutional authority over the affairs of the University.

As the courts have repeatedly declared: "'The power of the Regents to operate, control, and administer the University is virtually exclusive'" (*Regents of the University of California* v. *Superior Court*, *supra*, 3 Cal.3d 529, 540), "the Regents' powers of organization and government are broad, while the Legislature's power to regulate the university and the Regents is quite limited" (*Simpson* v. *Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 349), which "contrasts with the comprehensive power of regulation the Legislature possesses over other state agencies" (*San Francisco Labor Council* v. *Regents of University of California*, *supra*, 26 Cal.3d 785, 788).

The Legislature may of course "exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution," with any doubt as to the Legislature's power "'resolved in favor of the Legislature's action.'" (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3 685, 691.) In determining whether the Legislature may subject the University's pharmacies to the requirements of the Pharmacy Law, we look solely to

_____

4. Although section 4039 was amended in 1980 (Stats. 1980, ch. 948, § 1) to specifically include "state governmental agency, or political subdivision," we do not suggest that the amendment was necessary to place the University within the scope of the definition. (See *San Francisco Labor Council* v. *Regents of the University of California* (1980) 26 Cal.3d 785, 789 ["the university is so autonomous that, unlike other state agencies, it is subject to . . . laws . . . applicable to private persons and private universities"]; *City Street Imp. Co.* v. *Regents, etc.* (1908) 153 Cal. 776, 779 ["the university . . . is not clothed with the sovereignty of the state"]; *Estate of Royer*, *supra*, 123 Cal. 614, 624 ["The university is not the sovereign. . . . the statute applies to the university as a public corporation"].)

the provisions of the Constitution.  Do they deny the Legislature's power in this area, either expressly or by necessary implication?

Section 9 of article IX of the Constitution states:

"(a)  The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, <u>subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute</u> for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services. . . .

" . . . . . . . . . . . . . . . . . . . . .

"(f)  The Regents of the University of California shall be vested with the legal title and the management and disposition of the property of the university and of property held for its benefit and shall have the power to take and hold, either by purchase or by donation, or gift, testamentary or otherwise, or in any other manner, without restriction, all real and personal property for the benefit of the university or incidentally to its conduct; provided, however, that sales of university real property shall be subject to such competitive bidding procedures as may be provided by statute.  Said corporation shall also have all the powers necessary or convenient for the effective administration of its trust, including the power to sue and to be sued, to use a seal, and to delegate to its committees or to the faculty of the university, or to others, such authority or functions as it may deem wise.  The Regents shall receive all funds derived from the sale of lands pursuant to the act of Congress of July 2, 1862, and any subsequent acts amendatory thereof.  <u>The university shall be entirely independent of all political or sectarian influence and kept free therefrom in the appointment of its regents and in the administration of its affairs</u>, and no person shall be debarred admission to any department of the university on account of race, religion, ethnic heritage, or sex.

"(g)  Meetings of the Regents of the University of California shall be public, with exceptions and notice requirements as may be provided by statute." (Emphases added.)

The Constitution thus grants authority to the Legislature to (1) insure the security of the University's funds, (2) insure the University's compliance with the terms of its endowments, (3) regulate competitive bidding procedures for the University's contracts, and (4) provide notice and closed session requirements for the meetings of the Regents.  More significantly, the Constitution places authority in the Regents over (1) the organization and government of the University, (2) the management and disposition of the University's property, and (3) the administration of the University as a public trust.  Not only do these provisions place a restriction upon the Legislature's powers by necessary implication, especially by use of the phrase "subject only to such legislative control . . ." (see *San Francisco Labor Council* v. *Regents of University of California, supra*, 26 Cal.3d 785, 788), the Constitution expressly mandates that the University "be entirely independent of all political . . . influence . . . in the administration of its affairs."

In construing the governing constitutional language, the courts have found three areas where the Legislature may regulate the affairs of the University although not expressly so authorized in article IX. In *San Francisco Labor Council* v. *Regents of University of California*, *supra*, 26 Cal.3d 785, 789, the Supreme Court stated:

"It is true the university is not completely free from legislative regulation. In addition to the specific provisions set forth in article IX, section 9, there are three areas of legislative regulation. First, the Legislature is vested with the power of appropriation, preventing the regents from compelling appropriations for salaries. [Citations.]

"Second, it is well settled that general police power regulations governing private persons and corporations may be applied to the university. [Citations.] For example, workers' compensation laws applicable to the private sector may be made applicable to the university.

"Third, legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs. [Citation.]"

The first category mentioned, that of appropriations, is plainly inapplicable to our discussion of the Pharmacy Law. With respect to the second category of general police power regulations, it has been observed that "[t]he police power of the state finds its genesis in the state's inherent power to govern . . . which subjects the citizens of the state to reasonable regulation for the general welfare of society." (*Findley* v. *Justice Court* (1976) 62 Cal.App.3d 566, 571; see *In re Ramirez* (1924) 193 Cal. 633, 649-650; *Churchill* v. *Parnell* (1985) 170 Cal.App.3d 1094, 1098.) "It has long been settled that the police power extends to objectives in furtherance of the public peace, safety, morals, health and welfare, and is elastic and capable of expansion to meet existing conditions." (*People* v. *H & H Properties* (1984) 154 Cal.App.3d 894, 900; accord, *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 160.) Accordingly, the scope of the Legislature's general police power authority is exceedingly broad.

We believe that the Pharmacy Law fits squarely within this second category of "general police power regulations governing private persons and corporations." (See *Whalen* v. *Roe* (1977) 429 U.S. 589, 597-598 [51 L.Ed.2d 64, 97 S.Ct. 869] [requiring a patient's identification for prescriptions of certain dangerous drugs constitutes a reasonable exercise of police power]; *Kelley* v. *Johnson* (1976) 425 U.S. 238, 247 [47 L.Ed 708, 96 S.Ct. 1440] ["the promotion of safety of persons and property is unquestionably at the core of the State's police power"]; *People* v. *Privitera* (1979) 23 Cal.3d 697, 704-705 [the state has a "'vital interest in controlling the distribution of dangerous drugs'"]; *In re Gray, supra*, 206 Cal. 497, 499 ["for the preservation of public health and safety, the state may regulate and place proper restrictions upon the practice of pharmacy, and . . . in the exercise of its police power it may also regulate the manufacture, compounding and sale of drugs, medicines and poisons, where such regulation in any way reasonably tends to protect the public health, safety or morals"]; *Wilson* v. *California Health Facilities Com.* (1980) 110 Cal.App.3d 317, 323 [when "the state's legitimate interests in health and safety are involved, it may properly exercise its police powers"].)

*Williams* v. *Wheeler* (1913) 23 Cal.App. 619, was one of the first cases to affirm the authority of the Legislature to apply general police power statutes to the operations and affairs of the University. The court observed with respect to a statute requiring students to be vaccinated against smallpox:

"It is undoubtedly true . . . that there are certain subjects affecting the general welfare over which the legislature has been wisely invested with ultimate control. These subjects are those embraced within the general police powers of the state; and among them is the subject of the general health. . . . over this subject the state legislature has the ultimate control; and that in the exercise of that control it has power to pass general laws, in the nature of health regulations, upon the subject of vaccination prescribing the extent to which persons seeking entrance as students in educational institutions within the state must submit to its requirements as a condition of their admission; and . . . in so far as such an act of the legislature comes within the definition of a general law, and as such also comes within the general police powers of the state as a health regulation, the rules and regulations of the board of regents of the university must give way before it." (*Id.*, at p. 625.)

In *Wallace* v. *Regents, etc.* (1925) 75 Cal.App. 274, 278, the court stated:

"There is no question but that the legislature may under its police power limit or abrogate this right [of the Regents to adopt and enforce health measures covering University students], and, in fact, respondents do not claim otherwise, for they concede that the power vested under the constitution in the Regents is not so broad as to destroy or limit the general power of the legislature to enact laws for the general welfare of the public, including laws regulating the subject of vaccination, even though it might incidentally affect the University of California, as such a law would be paramount as against a rule of the Regents in conflict therewith."

Recently, in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, the Supreme Court noted the authority of the California Department of Health Services to regulate the University's operation of a School of Pharmacy with respect to "standards for radioactive particle concentrations in outside air." (*Id.*, at p. 411.) The Regents conceded the application of these police power regulations when it submitted an environmental impact report ("EIR") proposing the relocation of a biomedical research facility. As found by the Supreme Court:

"According to the EIR, the California Department of Health Services regulates and monitors the use of radioactive substances, and various other governmental agencies have established guidelines for handling hazardous wastes. In response to public questions on the draft EIR, the final EIR stated, "A California State Department of Health permit is required for disposal of these [carcinogenic] hazardous wastes." (*Id.*, at p. 419, fn. 21.)

The court also referred to "prior difficulties UCSF has had in complying with regulations governing the handling of [radioactive] materials" (*id.*, at p. 419), a "compliance inspection" by the State Department of Health Services that resulted in an "enforcement conference" (*id.*, at p. 420), and specifically found that "[t]he handling of radioactive substances is closely regulated and monitored, as evidenced by the oversight of UCSF's activities" (*ibid.*). Although the court modified an earlier order to allow the introduction of radioactive materials at the new location, it stated that "[t]his modification does not exempt UCSF from obtaining all required licenses and permits for the use of radioactive materials before introducing them to the Laurel Heights facility." (*Id.*, at p. 425, fn. 25.) *Laurel Heights* is thus replete with references to the Legislature's police power authority over the University's activities in the area of health regulations.

We are informed by the State Department of Health Services that it licenses and regulates the University's acute care hospitals, clinical laboratories, production of biologics, domestic water supply systems, hazardous waste facilities, radioactive materials, sources of ionizing radiation, and drug manufacturing. (See Health & Saf. Code, §§ 1254, 1265, 1612, 4011, 25810, 25815, and 26685.) These would be additional examples of health regulations applied to the University under the category of "general police power regulations governing private persons and corporations."

As for the third category mentioned in *San Francisco Labor Council* of "legislation regulating public agency activity . . . [concerning] matters of statewide concern not involving internal university affairs," we know of no case that has explored the relationship between "police power" regulations and "statewide concern" regulations. In *Tolman* v. *Underhill* (1952) 39 Cal.2d 708, however, the court stated "that laws passed by the Legislature under its general police power will prevail over regulations made by the regents with regard to matters which are not exclusively university affairs." (*Id.*, at p. 712.) *Tolman* was a governmental agency regulatory case, and its use of the word "exclusively" might explain more appropriately the test for a "statewide concern" type of regulation. Even assuming that a police power regulation may not encroach upon what is exclusively a University affair,[5] health regulations such as the Pharmacy Law would obviously have no difficulty meeting this requirement.[6]

Finally, we note that the Pharmacy Law does not impose a fee upon governmental agencies for obtaining a pharmacy permit; the fee is imposed solely upon the operation of "a nongovernmental pharmacy." (§ 4416, subd. (a).) Similar to many other statutes (see, e.g., Gov. Code, § 6103), this codifies the general practice of governmental agencies not charging other governmental agencies for services rendered. (See Atty.Gen.Opn. NS 3290 (1941) [the University need not pay the State Department of Public Health for its license to operate a hospital]; Atty.Gen.Opn. 10428 (1935) [the University need not pay the State Director of

---

5. It has been suggested that "educational decisions" (*Regents of the University of California* v. *Superior Court*, *supra*, 17 Cal.3d 533, 537), "the details of its internal government" (*Williams* v. *Wheeler*, *supra*, 23 Cal.App. 619, 623), "central functions" including "determination of the content of courses and curricula; requirements for degrees; conduct of research; establishment of policies and procedures concerning selection, retention, and conditions of employment of academic personnel; internal allocation of resources; initiation, administration, revision and termination of academic programs; establishment of patterns of internal governance; and determination of at least the academic aspects of admissions criteria" (Horowitz, The Autonomy of the University of California Under the State Constitution (1977) 25 UCLA L.Rev. 23, 37), and "decisions concerning faculty employment or student admissions" (Note, Autonomy and Accountability: The University of California and the State Constitution (1987) 38 Hastings L.J. 927, 928) might be considered within the category of "exclusively a University affair."

6. *Laurel Heights*, for example, focused primarily upon a "statewide concern" legislative regulation. The Regents conceded the application of the statutory scheme (*Laurel Heights Improvement Assn.* v. *Regents of University of California*, *supra*, 47 Cal.3d 376, 390-391) even though its application directly affected the siting of a research facility and could potentially disrupt ongoing scientific research, cause the loss of faculty members and research funds, and require substantial sums of money for relocation if the Regents did not comply with the statutory scheme (*id.*, at p. 424). These possible intrusions into the University's internal affairs did not merit even brief questioning concerning the Legislature's powers over the University's activities.

Agriculture for its license to operate a creamery].)[7]  While an argument may be made that a University pharmacy should be considered "a nongovernmental pharmacy" (see *San Francisco Labor Council* v. *Regents of the University of California, supra*, 26 Cal.3d 785, 789 ["the university is so autonomous that, unlike other state agencies, it is subject to . . . laws . . . applicable to private persons and private universities"]; *Estate of Royer, supra*, 123 Cal. 614, 624 ["The university . . . is not clothed with the sovereignty of the state and is not the sovereign"], we believe that the University would not be required to pay the fee of section 4416 under the ordinary definitions of its terms (see *City Street Imp. Co.* v. *Regents, etc., supra*, 153 Cal. 776, 779 ["the University [is] a governmental institution and an instrumentality of the state"]; *California State Employees Assn.* v. *State of California, supra*, 32 Cal.App.3d 103, 109 ["The University is a constitutional department or function of the state government"]; *Pennington* v. *Bonelli, supra*, 15 Cal.App.2d 316, 321 ["the University of California [is] a branch of the state itself"].)

In summary, the Pharmacy Law was enacted by the Legislature in the exercise of its police power authority to protect the general health and welfare of the public.  While the University is free from much of the Legislature's control, general police power regulations are applicable to the University unless the Legislature indicates otherwise.  Finding no exclusion from regulation for the University's pharmacies, we conclude that a pharmacy operated by the University is subject to the licensure, inspection, and disciplinary provisions of the Pharmacy Law.

* * * * *

---

7. In a 1948 memorandum to the Board, a Deputy Attorney General indicated that the University need not obtain a permit from the Board to operate a pharmacy.  The conclusion was based upon a misreading of our prior opinions, NS 3290 and 10428, as well as *Williams* v. *Wheeler, supra*, 23 Cal.App. 619, and *Davie* v. *Board of Regents, etc., supra*, 66 Cal.App. 693.  *Davie* held that the University was not liable for the negligence of a physician performing surgery at its hospital under the law then applicable. (*Id.*, at p. 700.)  Neither our prior opinions nor the two cases cited remotely suggested that the University was exempt from obtaining licenses required under general police power regulatory schemes protecting the public health and welfare.  The 1948 memorandum to the Board is disapproved.