[Civ. No. 26201. Second Dist., Div. One. Dec. 21, 1962.]

CATHERINE D. MUNDELL, Plaintiff and Respondent, v. DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL et al., Defendants and Appellants.

Stanley Mosk, Attorney General, and Warren H. Deering, Deputy Attorney General, for Defendants and Appellants.

Gordon & Weinberg and George P. Coulter for Plaintiff and Respondent.

FOURT, J.—This is an appeal by the Department of Alcoholic Beverage Control (hereinafter referred to as "Department") and the Alcoholic Beverage Control Appeals Board (hereinafter referred to as "Board") from a judgment granting respondent a peremptory writ of mandate.

The chronology of events is as follows:

On November 6, 1957, an accusation under the Alcoholic Beverage Control Act and State Constitution was filed.[1]

Upon due notice the charges set forth in the accusation were heard before a hearing officer of the Department. On February 13, 1958, the hearing officer's proposed decision was signed.[2]

On March 6, 1958, the Department adopted the hearing officer's proposed decision and "ordered that said decision shall become *operative* on April 17, 1958." (Italics shown.)

Subsequently respondent filed a petition for reconsideration with the Department. On March 21, 1958, the Department acted upon respondent's petition "by ordering that reconsideration be denied."

Thereafter respondent filed an appeal with the Board. The Board rendered its written decision affirming the decision of the Department.[3]

On November 30, 1959, respondent filed her petition for writ of mandate. On June 20, 1960, respondent filed an amended petition for writ of mandate. On July 6, 1960,

[1,2,3] See footnotes, 1, 2, and 3 at end of opinion.

respondent filed a second amended petition for writ of mandate.

Appellants filed their answer to the second amended petition for writ of mandate on July 14, 1960.

On August 5, 1960, respondent filed an amendment to second petition for writ of mandate and order. On the same date appellants filed their answer thereto.

Trial was had and the court had before it the record of the administrative proceedings before the Department including a reporter's transcript, and the record of the appeal before the Board. No additional evidence was taken.

On October 13, 1960, the findings of fact and conclusions of law were filed.[4] The judgment granting writ of mandate and remanding cause to administrative agency for further proceedings was entered October 18, 1960.[5]

The Department of Alcoholic Beverage Control is a constitutional agency. (Cal. Const. Art. XX, § 22.) It exercises limited judicial functions and its decision must be sustained if it has committed no error of law and if there is substantial evidence to support its findings of fact. (*Martin* v. *Alcoholic Beverage etc. Appeals Board*, 52 Cal.2d 238, 246 [340 P.2d 1]; *Marini* v. *Department of Alcoholic Beverage Control*, 177 Cal.App.2d 785, 786 [2 Cal.Rptr. 714].)

The courts, both trial and appellate, are bound in cases of this kind by the substantial evidence rule, and may not reweigh the evidence or pass on the credibility of the witnesses, or resolve the conflicting testimony contrary to the Department's findings. All legitimate and reasonable inferences must be indulged in support of the Department's decision. (*Samaras* v. *Department of Alcoholic Beverage Control*, 180 Cal.App.2d 842, 844 [4 Cal.Rptr. 857]; *Burako* v. *Munro*, 174 Cal.App.2d 688 [345 P.2d 124]; *Adler* v. *Department of Alcoholic Beverage Control*, 174 Cal.App.2d 256 [344 P.2d 336]; *Brice* v. *Department of Alcoholic Beverage Control*, 153 Cal.App.2d 315 [314 P.2d 807]; *Marcucci* v. *Board of Equalization*, 138 Cal.App.2d 605 [292 P.2d 264].)

The trial court purported to review the decision of the Department under the substantial evidence rule, but when the trial court's findings are measured in light of the Department's findings and the supporting evidence, it becomes apparent that the trial court improperly exercised its review functions.

---

[4,5] See footnotes 4 and 5 at end of opinion.

Illustrative of this is the trial court's finding of fact No. 4 (see footnote 4). Trial court's finding No. 4 relates to Department's finding No. 2 (see footnote 2). Department's finding No. 2 provides as follows:

"2. On September 9, 1956, Lyle Otterson and Lyle Shoemaker were upon the premises and Lyle Otterson struck Elmer C. Vanderwahl in the eye with a shuffleboard puck, causing a cut which required 14 stitches to close. This blow was without prior warning. Subsequently, the bartender on the premises was knocked from the outside of the premises through the plate-glass window to the inside of the premises."

The trial court's finding No. 4 provides in part as follows:

"4. The second finding of the . . . Department is without substantial evidence in the light of the whole record insofar as it implies any fault, negligence or wrongdoing on the part of . . . [respondent] or her employees . . . [Respondent] had refused to serve alcoholic beverages to the instigators of the incident and had no right to do more as long as the individuals complied with the law. *There is no showing that any alcoholic beverages were served to these individuals by* . . . [respondent's] *employees.* The finding specifically states that the blow causing injury to Elmer C. Vanderwahl was without prior warning, and there is no showing that the blow was struck intentionally. As to the attack on . . . [respondent's] bartender, this occurred outside the licensed premises when the bartender sought to summon officer's aid." (Emphasis added.)

Viewing the evidence in the light most favorable to the Department, the record discloses the following testimony:

1. *Mr. Elmer C. Vanderwahl*

a. *Direct Examination:*

"Q. In other words, you were in the premises about two or three hours? A. Correct.

". . . . . . . . . . . .

"Q. All right. Then what happened after you were in the premises for some time? A. Well, we was playing shuffleboard. First thing I know I got struck with a shuffleboard puck.

"Q. Can't hear. I'm sorry. A. *The first thing I knew I was playing shuffleboard when all at once this fellow came up and hit me with a shuffleboard puck for no reason at all.*

"Q. Are you referring to Lyle Shoemaker or Lyle Otterson, O-t-t-e-r-s-o-n? "A. *Otterson, correct.*

"Q. When did you first notice Lyle Shoemaker and Lyle Otterson on the premises? Were they there when you arrived? A. Yes, they were.

" . . . . . . . . . . . .

"Q. *Were they having anything to drink?*

" . . . . . . . . . . . .

"A. *Sure.*

"Q. Did you notice whether they were drinking consistently or just one or two drinks? A. Well, I wasn't paying too much attention how much they were drinking. They were drinking. They were there before I got there.

" . . . . . . . . . . . .

"Q. Did you notice the behavior of Otterson and Shoemaker prior to your being struck? A. Well, it is hard to tell what these two fellows would do. They'd act nice and maybe next time you wouldn't know what they are going to do. They are unstable fellows.

"Q. I am referring particularly to the conduct and behavior of these two men on this date, not what their general— A. Well, they behaved pretty well for a while and all at once they'd just flare up and that is the way they'd start fighting.

" . . . . . . . . . . . .

"Q. Where were you injured? A. On my right eye.

"Q. What treatment was required? A. I had 14 stitches in my eye, above and below."

(Emphasis added.)

2. *Deputy Sheriff E. A. Kirby*

a. *Direct Examination:*

"Q. Now, please tell the Hearing Officer what you observed and what you did after you arrived at these premises on the evening in question [i.e. September 9]. A. We observed Mr. Vanderwall [*sic*] sitting on the bar stool holding his hand over his face. He had a wet cloth and was holding it to his eye, it being cut; and we requested an ambulance to send him to Park Emergency Hospital; and we talked to the bartender and a couple of other gentlemen at the location; and they stated that—one gentleman stated that the suspects Otterson and Shoemaker had been at the location for some time; and one of the gentlemen stated that one of the suspects—I can't recall now which one it was—had offered him $30 to fight with him and which the witness at that location declined. We talked to Freddie Joe Brown [i.e. bartender on duty] who

stated that when he saw the fight he had run outside to the phone booth just outside the front door of the location and placed a call to the Sheriff's Department, and one of the suspects had come out there and grabbed him as he was coming out of the phone booth and struck him and knocked him through the window back into the location.

"Q. Was this a plate-glass window? A. Yes, it is.

" . . . . . . . . . . . . .

"Q. By Mr. Olczyk: Did you notice any glass or anything on the premises' floor when you went in? A. Yes.

"Q. What did you find? A. There were broken beer glasses and broken beer bottles on the floor and tables had been knocked over.

"Q. Was the place in disorder? A. Yes."

3. *Christine Thwaits* (manager of bar, sister of licensee and witness for respondent)

a. *Direct Examination:*

"Q. By Mr. Webb: Are you acquainted with Shoemaker and Otterson? A. I had met them about a week before this fight [i.e. the fight of March 19, 1956].

" . . . . . . . . . . . . .

"Q. Particularly Otterson and Shoemaker, what can you tell us about them? A. They are strictly trouble-makers. I 86'd them—

"Q. You use an expression you '86'd' them. What does that mean? A. You don't serve them. If they ever return, you don't serve them ever."

b. *Cross-Examination:*

"Q. When was Lyle Otterson 86'd? A. Well, after the first fight they had in there, I told everyone that was working there to 86 him.

"Q. The first fight was in March of 1956? A. Yes.

"Q. Is that when they were 86'd by you? A. Yes; then they didn't come back for quite sometime.

"Q. Then they came back on September 9, 1956? A. I had another bartender on. Freddie was working—Freddie Joe Brown. . .

"Q. Were Lyle Shoemaker and Lyle Otterson drinking in your place of business on September 9? A. Yes.

"Q. Before the fight? A. Yes, but Fred didn't know that they were 86'd. I was in bed from an accident."

The Department's hearing officer could reasonably infer from the evidence that respondent's bartender allowed

Shoemaker and Otterson to continue to drink and agitate and challenge patrons in the premises over a period of two or three hours without taking any effective action by summoning police. The resulting fight and the injury to patron Vanderwahl were a logical consequence to their behavior and this should have been apparent to the bartender. Such passive conduct on the part of the bartender amounts to ''permitting'' the conduct to occur. (See *Swegle* v. *State Board of Equalization,* 125 Cal.App.2d 432, 438 [270 P.2d 518]; *Givens* v. *Department of Alcoholic Beverage Control,* 176 Cal.App.2d 529, 533-534 [1 Cal.Rptr. 446].)

No useful purpose would be served by discussing at length each separate finding. Suffice it to say, we have reviewed the record and find the Department's findings are supported by substantial evidence.

The next issue is whether respondent was deprived of due process and equal protection of the law. The trial court's finding of fact No. 11 (footnote 4) provides in part as follows:

''11. . . . [Respondent] was deprived of a fair hearing by the . . . [appellant] in that a witness was called on behalf of . . . Department, identified as the custodian of certain sheriff records, and asked about comparison of the . . . [respondent's] premises with others in the neighborhood, but upon objection by . . . [respondent's] counsel, and request for permission to examine the records, and to cross-examine the witness on them, and after . . . [appellants'] counsel had characterized . . . [respondent's] premises as a 'police problem', the witness was withdrawn, and . . . [respondent] was denied the opportunity to examine the sheriff's records.

### ''*Conclusions of Law*

''. . . . . . . . . . . .

''3. The refusal of . . . [appellants] to allow ... [respondent] to examine records which [appellants'] counsel inferred would establish that . . . . [respondent's] business was a 'police problem' in comparison to other similar establishments, and the refusal to allow . . . [respondent] to cross-examine on such records, constitutes a violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.''

The record does not support the trial court's finding or conclusion. The reporter's transcript of the proceedings before the hearing officer discloses the following:

"DIRECT EXAMINATION

"BY MR. OLCZYK:

"Q. Please state your name. A. Walter R. Howell, H-o-w-e-l-l.

"Q. What is your occupation? A. I am Deputy Sheriff currently assigned to the Sheriff's Lennox Station.

"Q. What is your rank and title? A. Lieutenant.

"Q. What is your assignment at Lennox? A. I am a patrol lieutenant currently a night watchman.

"MR. WEBB: May I get your name?

"WITNESS: Howell, H-o-w-e-l-l.

"Q. BY MR. OLCZYK: How long have you been assigned to Lennox? A. I have been assigned to Lennox Station approximately two months.

"Q. Now, as a lieutenant at this station, do you have under your control and custody the records of the substation? A. That is correct, sir.

"Q. And in connection with this hearing, did you examine the various reports and records, as well as statistics, regarding the location of the Big Chris at 13766 Inglewood Avenue, Hawthorne? A. I had occasion to make a cursory examination, sir, just for this particular hearing.

"Q. Now, did you have an opportunity to compare the operation of the Big Chris as to any other licensed premises in the territory?

"MR. WEBB: Just a minute. I object. It is incompetent, irrelevant and immaterial. In the first place he is talking about records. We are entitled to see the records if he so examined them if there are records written. Object on the grounds it is incompetent, irrelevant and immaterial and just calls for a conclusion of this witness.

"HEARING OFFICER: What is your offer in this regard, Mr. Olczyk, if any?

"MR. OLCZYK: I offer to show through this witness in his experience at the Sheriff's Office at Lennox that the Big Chris Cafe has been a police problem to them and it is aggravated as compared to any other license in the area.

"MR. WEBB: I'd like to look those records over then because I understand it is not the case.

"HEARING OFFICER: Well, I think you are going to have to lay a substantial foundation and I think undoubtedly in doing so counsel should be given the opportunity either to use the records now or during cross-examination.

"Mr. Olczyk: Well, in that event, Your Honor, I will just withdraw the testimony of this witness.

"Hearing Officer: We will take a ten-minute recess.

"After Recess

"Hearing Officer: Let the record show that the parties are present in the hearing room.

"Are you prepared to proceed, Mr. Webb?

"Mr. Webb: Christine Thwaits."

 It is clear from the above set forth portion of the transcript that there was *no evidence* introduced tending to show that respondent's premises constituted a "police problem." An offer of proof is not evidence. Nor does the record support any inference that respondent was denied the opportunity to examine either the police officer or the records.

 As stated in *Morell* v. *Department of Alcoholic Beverage Control*, 204 Cal.App.2d 504 [22 Cal.Rptr. 405] at page 518:

" . . . The propriety of the penalty imposed by an administrative agency is a matter vested in the discretion of such agency and its decision thereon will not be disturbed unless there has been a clear abuse of discretion. (Citation.) This court is not free to substitute its own discretion in the matter. (Citation.) We find no abuse of discretion in the record."

The judgment of the trial court is reversed.

Wood, P. J., and Lillie, J., concurred.

---

[1]The following was alleged in the accusation:

"On or about March 19, 1956, September 10, 1956 and on or about March 3, March 18, and April 14, 1957 the above designated premises was a place where persons engaged in activity and conduct and created conditions all of which were then and there contrary to the public welfare and morals, more particularly described as follows:

"That on each of said dates persons engaged in fights and disturbances on said premises.

"Licensee(s) Previous Record: Licensed since 9/16/55.

"Disciplinary Action—None

"(1) That by reason of the foregoing facts, grounds for suspension or revocation of such license(s) exist and the continuance of such license(s) would be contrary to public welfare and morals, as set forth in Article XX, Section 22, State Constitution, and Section 24200(a), Business and Professions Code;"

[2]The proposed decision provides in part as follows:

"*Findings of Fact*:

"1. On March 19, 1956, a fight occurred upon respondent's premises which was provoked by Lyle Otterson and Lyle Shoemaker. During this

fight, Stella Teller, a female, was rendered unconscious; Cecil Teller, a male, received a lump on the head and a black eye; and Henry Madison, a male, was cut so that his cheek was laid open. As a result of this incident, respondent's manager ordered Lyle Otterson barred from the premises.

"2. On September 9, 1956, Lyle Otterson and Lyle Shoemaker were upon the premises and Lyle Otterson struck Elmer C. Vanderwahl in the eye with a shuffleboard puck, causing a cut which required 14 stitches to close. This blow was without prior warning. Subsequently, the bartender on the premises was knocked from the outside of the premises through the plate-glass window to the inside of the premises.

"3. On March 3, 1957, Kurt Bowling and Jack Cox met at the entrance to the premises and commenced to argue. When respondent's manager sought to telephone for police assistance at a phone booth on the outside of the premises, Kurt Bowling tore the telephone receiver from the telephone and struck her with it.

"4. On March 16, 1957, five persons entered the licensed premises and attempted to provoke a fight and challenged persons to fight. Charles D. Collette accepted an invitation to leave the premises with one of the five persons and when outside was knocked down, struck and kicked by all of the five persons. Charles D. Collette was joined by Harry Collette and John Babcock who were knocked down and kicked.

"5. On April 13, 1957, a Navy enlisted man and a Marine enlisted man commenced to fight in respondent's premises. A large number of persons became involved in this fight; and Charles Penrod had his nose almost severed from his face; David Bender received lumps, contusions and abrasions about his face; and a Navy enlisted man received a stab wound in the back.

"6. During the period following March 19, 1956, at various times and dates, other persons upon respondent's premises did attempt to fight and challenge to fight. Respondent through her employees had reason to expect that fights and disturbances upon her premises were probable unless adequate and effective means were adopted to control the conduct of the patrons upon her premises. Respondent did conduct her business during this period entirely through three regular employees of whom two were females and one male and one additional male employee who worked as an extra employee intermittently. Respondent was a full-time employee elsewhere and did not perform work upon the premises herself.

"FINDINGS AS TO PREVIOUS RECORD: Licensed since September 16, 1955. No prior disciplinary action.

"DETERMINATION OF ISSUES PRESENTED: Continuance of the license would be contrary to public welfare and morals and therefore grounds for revocation of the license exist under the provisions of Section 24200 (a), Alcoholic Beverage Control Act, and Article XX, Section 22, California Constitution.

"PENALTY OR RECOMMENDATION: The license is revoked."

---

[3]The Board's decision, in addition to setting forth in *haec verba* the Department's six findings of fact (see footnote 2) stated the following:

"In her notice of appeal . . .[respondent] recites all available grounds as the basis for the appeal. In argument before this Board, the only question pursued was the sufficiency of the evidence. This is the only question with which we shall deal at length. Our review of the record shows the other contentions to be without merit.

"The record here shows an operation where the licensee is employed full-time elsewhere and does not work on the licensed premises. The business is managed by appellant's sister who works one shift each day, and in addition, two barmaids and one bartender. The only telephone is located outside the premises. The record shows further, that during a period of approximately one year there were at least four disturbances

on the premises requiring the presence of police officers. These disturbances consisted of fights; they were vicious, resulting in very serious physical injuries to some participants and extensive property damage. *It appears that these fights were caused not by . . .* [respondent's] *regular customers, but by troublemakers who were not welcome on the premises.* [Emphasis added.] (However, the disturbances of March 19, 1956, and September 9, 1956, were instigated by the same parties who were known to the barmaid as troublemakers and had been ('86'd.') [*sic*]. On all occasions at least some of the persons engaged in the fights had been drinking on the premises for some time prior thereto.

''There is no question but what the incidents briefly outlined above are sufficient to constitute the premises a *disorderly house* [emphasis added] within the meaning of the Alcoholic Beverage Control Act, if they were *permitted* [italics shown] by . . . [respondent], *People* v. *Smith,* 48 Cal.App. 253 [191 P. 996]. The deductions which the Department could and must have drawn from these acts, when considered in connection with the attendant circumstances, may properly form the basis for this disciplinary action. *People* v. *Smith, supra.*

''The law imposes a duty upon the licensee to conduct his premises in an orderly and lawful manner, the standard depending upon the facts and circumstances of the particular case. The courts in defining the word 'permit,' as that term is used in Section 25601, appear to follow a rule of reasonable care on the part of the licensee . . .

''. . . [respondent] may not reasonably expect to be allowed the privilege of operating a licensed premises in a manner conducive to the conduct revealed by this record and then to be looked upon with favor because she seeks the assistance of the sheriff's office in quelling the resulting disturbances. The record reveals no precautions taken by . . . [respondent] to prevent these fights other than to summon aid when they began. (The manager of the premises, Christine Thwaits, testified that she had discussed this matter with . . . [respondent] and arrived at the policy of calling for help when trouble started.) And even as to this, the person calling for help had to leave the premises to get to a telephone.

''In our opinion the activities above described were 'permitted' by . . . [respondent] within the meaning of the Alcoholic Beverage Control Act.

''In view of the foregoing the decision of the Department of Alcoholic Beverage Control in the present proceeding is hereby affirmed.

''. . . . . . . . . . . .

''It is hereby certified that on October 19, 1959, the Alcoholic Beverage Control Appeals Board adopted the above decision.''

⁴The findings of fact and conclusions of law are as follows:

''*Findings of Fact*

''. . . . [The trial court found certain allegations of respondent's second amended petition for writ of mandate and certain allegations of respondent's amendment to second amended petition for writ of mandate to be true. In addition, the trial court found that certain allegations of appellants' answer to the second amended petition for writ of mandate and of appellants' answer to amendment to second amended petition for writ of mandate to be untrue.]

''2. There is not substantial evidence in the record to sustain the allegations of the accusation against . . . [respondent]; the record shows that . . . [respondent] and her employees exercised due and reasonable care to maintain public welfare and morals in the licensed premises.

''3. The first finding of the . . . Department [see footnote 2], as far as it goes, is supported by substantial evidence in the light of the whole record. With respect to the finding, however, the Court finds also that the principals involved in the altercation were known to the management for a period of only two or three weeks before the incident; that the said

principals were in the premises contrary to the wishes of the management, but management had no right to evict them as long as they did nothing to warrant eviction; that as soon as the said principals did commit an act which warranted it, the management denied further service to both of them.

"4. The second finding of the . . . Department [see footnote 2] is without substantial evidence in the light of the whole record insofar as it implies any fault, negligence or wrongdoing on the part of . . . [respondent] or her employees . . . [Respondent] had refused to serve alcoholic beverages to the instigators of the incident and had no right to do more as long as the individuals complied with the law. There is no showing that any alcoholic beverages were served to these individuals by . . . [respondent's] employees. The finding specifically states that the blow causing injury to Elmer C. Vanderwahl was without prior warning, and there is no showing that the blow was struck intentionally. As to the attack on . . . [respondent's] bartender, this occurred outside the licensed premises when the bartender sought to summon officer's aid.

"5. The third finding of the . . . Department [see footnote 2] is without substantial evidence in the light of the whole record insofar as it implies any fault, negligence or wrongdoing on the part of . . . [respondent] or her employees. The incident referred to occurred outside the licensed premises after . . . [respondent's] manager had barred access to a known troublemaker. The incident occurred without provocation or warning . . . [Respondent's] manager was attacked by the troublemaker when she sought to summon sheriff aid.

"6. The fourth finding of the . . . Department [see footnote 2] is without substantial evidence in the light of the whole record insofar as it implies any fault, negligence or wrongdoing on the part of . . . [respondent] or her employees. The fight mentioned in the finding occurred outside of the licensed premises after all persons inside the premises, particularly . . . [respondent's] employees, sought to prevent a disturbance. The officers were called, and . . . [respondent's] employees cooperated fully with them. The fight was provoked by persons unknown to the management, not by regular customers.

"7. The fifth finding of the . . . Department [see footnote 2] is without substantial evidence in the light of the whole record insofar as it implies any fault, negligence or wrongdoing on the part of . . . [respondent] or her employees. The fight mentioned in the finding was instituted by persons unknown to the management, and without prior warning. The management had no reason to suspect the pugnacious tendencies of the principals, and could not have anticipated the disturbance. The manager took prompt and effective measures to quell the disturbance, evicting both of the instigators of the fight, and taking a knife away from one of them. The officers were called promptly, and . . . [respondent's] employees cooperated fully with them.

"8. The sixth finding of the . . . Department [see footnote 2] is without substantial evidence in the light of the whole record insofar as it implies any fault, negligence or wrongdoing on the part of . . . [respondent] or her employees.

"(a) There is no evidence that any fights or disturbances occurred in the licensed premises during the period mentioned except for those described in Findings No. 2 and No. 5, the other altercations described in the findings having occurred outside the licensed premises, and no other fights or altercations having been shown. Of these three incidents, two involved persons who were not shown to have been in the premises previously, and in these two instances, it is clear that management had no reason to anticipate difficulty on either occasion, and that prompt and effective measures were taken to control the difficulty when it did occur. Only one incident involved persons shown to have been upon the premises upon a previous occasion. In that instance, the evidence is clear that there was no prior warning for the striking of one of the

customers, and it could not have been anticipated by . . . [respondent's] employees. There is no showing that this striking was intentional. There is no showing that the instigators had been served any alcoholic beverages by . . . [respondent's] employees. There is no showing that the instigators had been convicted of any crime prior to the incident, nor is any other reason shown which would have given . . . [respondent] the right to keep these individuals out of a public space. Prompt and effective measures were taken to control the disturbance. At least a part of the disturbance did not occur inside the licensed premises at all.

"(b) The finding that 'at various times and dates, other persons upon . . . [respondent's] premises did attempt to fight and challenge to fight' does not support the decision and penalty imposed, but stands rather as a credit to the licensee and her employees, as it indicates that they were effective in preventing disturbances.

"(c) The finding that . . . [respondent] 'through her employees had reason to expect that fights and disturbances upon her premises were probable unless adequate and effective means were adopted to control the conduct of the patrons upon her premises' is not true. The evidence clearly shows that . . . [respondent's] premises had a long-standing reputation as a neighborhood 'family' beer bar, frequented by married couples, and that reasonable means were employed to prevent and to control fights and disturbances which might be foreseeable.

"(d) As to that portion of the sixth finding [see footnote 2] that deals with the fact that . . . [respondent] conducted the business through employees while she worked elsewhere, there can arise no inference that such action was improper. It would appear that . . . [respondent's] sister, the manager employed by . . . [respondent], was quite competent and able in carrying out management duties in . . . [respondent's] behalf, and the conduct of all of . . . [respondent's] employees was above reproach.

"9. The Court finds that the . . . [respondent's] premises were not kept in a manner adverse to public welfare and morals. All pertinent testimony in the record, including that of the victims of various incidents, characterizes the business as a 'neighborhood' or 'family' bar, at which management was vigilant in maintaining order. The record shows that, under the same management, little trouble occurred over a long period of years, and most of the trouble occurred within a brief span of a few months. The fights, in virtually every instance, were caused not by regular customers, but by troublemakers who were not welcome on the premises. The management did not permit intoxicated persons in the premises, and refused to serve alcoholic beverages to known trouble-makers. There is not substantial evidence in the record to sustain a charge that fights and disturbances occurring in the premises were 'permitted' by . . . [respondent] within the meaning of the Alcoholic Beverage Control Act.

"10. As indicated hereinabove, the findings of the . . . [appellant] Department do not support the decision and penalty of revocation of . . . [respondent's] beer license; and the . . . [appellants] acted arbitrarily, and capriciously, and in abuse and in excess of discretion imposed in them in making such decision, and in imposing such penalty, and in affirming said decision and penalty upon appeal therefrom by . . . [respondent]. Good cause was not shown for revocation of . . . [respondent's] license.

"11. . . . [Resopndent] was deprived of a fair hearing by the . . . [appellants] in that a witness was called on behalf of . . . Department, identified as the custodian of certain sheriff records, and asked about comparison of the . . . [respondent's] premises with others in the neighborhood, but upon objection by . . . [respondent's] counsel, and request for permission to examine the records, and to cross-examine the witness on them, and after . . . [appellants'] counsel had characterized

. . . [respondent's] premises as a 'police problem,' the witness was withdrawn, and . . . [respondent] was denied the opportunity to examine the sheriff's records.

"12.　　・　　・　　・　　・　　・　　・　　・　　・

*"Conclusions of Law*

"1. In view of the Court's finding that the continuance of . . . [respondent's] beer license was not shown to be prejudicial to public welfare and morals, the Court concludes that the affirmative defense of laches is without merit.

"2. The decisions of . . . [appellants] herein, and the penalty imposed by . . . [appellants], were and are arbitrary and capricious, and harsh, and unjust, and not supported by the findings or by substantial evidence in the light of the whole record. In making such decisions, and in imposing such penalty, the [appellants] abused the discretion imposed in them under the Constitution and laws of this state.

"3. The refusal of . . . [appellants] to allow . . . [respondent] to examine records which . . . [appellant's] counsel inferred would establish that . . . [respondent's] business was a 'police problem' in comparison to other similar establishments, and the refusal to allow . . . [respondent] to cross-examine on such records, constitutes a violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

"4. The duty of an alcoholic beverage licensee to preserve public welfare and morals is measured by the standard of reasonable care under the circumstances; the licensee is not responsible for acts occurring outside the licensed premises, nor is he responsible for unlawful acts of his patrons which are neither 'permitted' nor encouraged by him.

"5. While a licensee has a right to refuse service to anyone whom he considers undesirable because of known pugnacious tendencies, or because intoxicated, he may not deny anyone permission to be in a public restaurant or bar for so long as that person is acting properly and not committing illegal or immoral acts. The proprietor has no right to exclude or eject a patron 'except for good cause,' and if he does so without good cause, he is liable in damages to the person or persons concerned.

"6. . . . [Conclusion No. 6 was stricken.]

"7. While the Constitution and laws of the State of California impose in the Department of Alcoholic Beverage Control and the Alcoholic Beverage Control Appeals Board certain discretionary powers, sometimes referred to as quasi-judicial or adjudicating powers, with respect to revocation or suspension of alcoholic beverage licenses, that discretion is not absolute, but must be exercised in accordance with the law, which requires that revocation may be only 'for good cause.'

"8. From the foregoing facts and conclusions of law, the Court concludes that the acts of . . . [appellants] in imposing and upholding the decision and penalty of revocation of . . . [respondent's] beer license were unlawful, and in excess of jurisdiction, and not supported by the findings, nor by substantial evidence in the light of the whole record; that accordingly it is the legal duty of . . . [appellants] to annul, set aside, and hold for naught the order of revocation heretofore made, and to restore . . . [respondent's] on-sale beer license to the . . . [respondent] forthwith; that . . . [respondent] is entitled to judgment that the peremptory Writ of Mandate issue to compel . . . [appellants] to restore said license to . . . [respondent], and for her costs incurred herein, in the amount and sum of $_____."

---

[5]The judgment provides in pertinent part as follows:

"It is ordered, adjudged and decreed that Petitioner [i.e. respondent] have judgment granting the Peremptory Writ of Mandate to set aside the decision and order of . . . [appellant] Department . . . dated March

6, 1958, and the findings therein contained, and to set aside the decision of . . . [appellant] . . . Board, dated October 19, 1959, with instructions to accord Petitioner [i.e. respondent] and licensee a fair hearing, reconsider the matter, and take such steps and make such disposition as will be in accordance with the decision herein rendered and in accordance with the law.

"The cause is hereby remanded to the Department . . . for reconsideration in the light of the Court's opinion and judgment, and for such further action as is specifically enjoined upon the . . . [appellants] by law. " . . . . . . . . . . ."