[Civ. No. 24471.   First Dist., Div. Three.   Oct. 28, 1968.]

CHIZUKO ISHIMATSU, Plaintiff and Appellant, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent.

Garry, Dreyfus, McTernan & Brotsky, Charles R. Garry and Fay Stender for Plaintiff and Appellant.

Thomas J. Cunningham, Milton H. Gordon and James E. Holst for Defendant and Respondent.

BROWN (H. C.) J.—This is an appeal from a judgment denying a petition for a peremptory writ of mandamus directed to the Regents of the University of California to show cause why the discharge of petitioner should not be set aside and petitioner be reinstated with back pay as a librarian with the University of California.

The Facts: Appellant was employed by the University of California (University) on February 1, 1962, as head of the medical center catalog department, professional classification "Librarian II." On July 1, 1963, she was reclassified to the position of "Librarian III." *Her term of employment was designated as indefinite.* On December 28, 1964, appellant was advised in writing by her immediate supervisor that her employment with the University would be terminated January 12, 1965. The reason given for the termination was "[s]upervisory relationships with subordinates made it impossible for employee to be retained." Appellant claimed

that she was wrongfully discharged and requested that her grievance be investigated by proceedings applicable to that class of academic employees who could be discharged only for cause. President Kerr, however, directed that her grievance be heard pursuant to the provisions applicable to nonacademic employees and appointed Professor Mason Haire, the resident psychologist of the Institute of Industrial Relations at Berkeley, California, as the hearing officer.

Professor Haire, after conducting the hearings which lasted two days, recommended that the dismissal be sustained and Chancellor Saunders accepted the recommendation. Appeals to President Kerr and to the board of regents were denied. Appellant thereafter filed a petition for writ of mandate in the San Francisco Superior Court to command the regents of the University to set aside her dismissal and to restore the position to her with back pay or to refer her administrative appeal to the appropriate unit of the University's grievance structure. The court found that appellant was employed on a nontenure status; that the University had power to adopt personnel practices regarding its employees and to conduct quasi-judicial hearings; that the University was not required by law to find cause as a prerequisite to termination of appellant's employment, and that there was substantial evidence supporting the hearing officer's findings. The court ordered judgment denying the petition for the writ of mandate.

Two questions have been raised by the parties on this appeal: (1) does appellant come within the classification of academic employees who could be discharged only for cause after a hearing by a committee of the academic senate, and (2) does the Constitution of the State of California delegate to the University quasi-judicial power to conduct hearings concerning its personnel so that in judicial review the courts are limited to determining the existence of substantial evidence supporting the University's decision and, if so, was there substantial evidence present here?

Appellant contends that under the directives from the President of the University, Clark Kerr, dated June 18, 1962 and July 2, 1962, she, as a librarian, was classified as an academic employee, and that as such she was entitled to a hearing for cause under the July 2, 1962 directive which provides that librarians would be under the jurisdiction of the president's office, or pursuant to the rules of the University pertaining to hearings for academic employees.

When appellant was first employed by the University on February 1, 1962, her designation as "Librarian II" brought her within the University's classification of nonacademic employee. Her employment tenure was "indefinite." The University had formulated an elaborate and formal grievance procedure for nonacademic personnel. These rules (rule 26.2, Nonacademic Personnel Rules) provided that each campus chief should establish formal grievance procedures which should include provision for mediation of these grievances, appeal to the department chairman and campus personnel appeals officer, written grievances, and hearings by a campus appeals commission or a hearing officer appointed by the chairman or president. The committee or personnel officer hearing the grievance is not authorized to make any final decision but, instead, makes a recommendation to the chancellor or president of the University who thereafter renders the decision.

Rule 26.2 of the Nonacademic Rules of the University relative to grievance hearings does not contain language which would compel the University to show cause before discharging an employee who did not come within the classification of professor, associate professor or their equivalent ranks. Such employees could be terminated at will. (See *Ruinello* v. *Murray,* 36 Cal.2d 687, 689 [227 P.2d 251]; *Maillard* v. *Boring,* 182 Cal.App.2d 390, 394 [6 Cal.Rptr. 171].) A different procedure was provided under chapter VI 3(j) and chapter VI 2(a), Standing Orders of the Regents of the University, for specified academic employees and those of equivalent rank designated by the president of the University and approved by the board of regents. These specified academic employees could be discharged only for cause after a hearing by a committee of the academic senate.[1]

---

[1]The rules and regulations applicable to *specified* academic employees are set forth in the "Standing Orders of the Regents of the University of California" (ch. VI 3(j) and ch. VI 2(a)) as follows: "(j) All appointments to the position of Professor and Associate Professor and to positions of equivalent rank (see Section 2(a) and Chapter VI) are continuous in tenure until terminated by retirement, demotion or dismissal. *The termination of a continuous tenure appointment or the termination of the appointment of any other member of the faculty before the expiration of his contract, shall be only for good cause,* after the opportunity for a hearing before the properly constituted advisory committee of the Academic Senate." (Italics added.)

Chapter VI 2(a) provides: "*Equivalent Rank and Privileges.* (a) The ranks of astronomers, associate astronomers, assistant astronomers, and junior astronomers shall be equivalent to that of, and their academic privileges shall be the same as those of, professors, associate professors, assistant professors, and instructors, respectively, the length of service

The directives relied upon by appellant consist of letters written by President Clark Kerr to all campus officers. On July 2, 1962, President Kerr wrote as follows: "Office of the President July 2, 1962 CHIEF CAMPUS OFFICERS: Enclosed herewith is a new classification and salary compensation plan for professional Librarians in the University. Under date of May 21, 1962, I sent you the following statement:

'Effective July 1, 1962, professional librarians will be classified as academic employees and will come under the jurisdiction of the Academic Personnel Offices.'

"This statement is now amended to read:

'Under the new classification and salary compensation plan, *professional librarians will be classified as academic employees*. At the statewide level they will come under the jurisdiction of the Academic Personnel Unit in my office.' [Italics ours.] . . .

"The change from nonacademic to academic status will not affect existing fringe benefits and working conditions. . . . /s/ Clark Kerr."

The July 2, 1962 letter and an accompanying memorandum specified numerous changes under the new academic classification, but there was no reference to tenure of librarians nor was there any change specified in grievance hearing procedures. It is to be particularly noted that the record is silent as to any approval as to the change of the status of librarians by the board of regents which approval is required by chapter VI 3(j) and VI 2(a) of the Standing Rule of the Board of Regents before librarians would attain status equivalent to professors and assistant professors.

In a letter dated November 5, 1965 (these proceedings commenced January 5, 1965, when appellant filed her claim of grievance and request for hearing), President Kerr attempted to clarify the meaning of the July 2, 1962 directive as follows: "In a memorandum dated July 2, 1962 outlining the new classification and salary compensation plan for professional librarian classes at the University, the following statement appeared: '*The change from nonacademic to academic status will not affect existing fringe benefits and working conditions.*' Under this statement, it was intended that any

being counted in each case from the date of original appointment. *The equivalent academic ranks of members of departments and stations where titles other than professor, associate professor, assistant professor, and instructor are used, shall be fixed by the President, subject to approval by the Board.*" (Italics added.)

grievances of professional librarians would continue to be governed by, and processed in accordance with, Nonacademic Personnel Rule 26 and campus regulations implementing that rule. It was also intended that all other nonacademic personnel rules not inconsistent with the new classification and salary compensation plan announced in the July 2 memorandum would continue to be applicable to librarians. This interpretation will continue in effect until completion of a study covering all non-faculty academic appointees including librarians.'' (Italics added.)

The May 21, 1962 directive (referred to in the July 2 letter of President Kerr), the July 2, 1962 directive and the November 5, 1965 clarifying letter indicate that the status of librarians was changed from nonacademic to academic personnel. The privileges of librarians under the new status, however, were limited to salary increases and working conditions as specified in the memorandum accompanying the July 2 letter. Appellant has objected to making President Kerr's letter of November 5, 1965 a part of the record on appeal as it was not introduced in evidence at the hearing or before the trial court. It appears, however, the letter was appended to the respondent's brief presented to the trial court and was properly made a part of the record on appeal. (Relative to introduction of evidence not produced before the hearing officer see *Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304] ; Code Civ. Proc., § 1094.5.) President Kerr's intention to retain grievance hearings for librarians may be inferred not only from his letter of November 5, 1965, but also from his action in directing that the nonacademic grievance procedure be followed relative to appellant's grievance and in denying her appeal.

It is concluded, therefore, that the trial court's finding that the ''conducted grievance hearing and proceeding were made in accordance with Respondent's [the University's] rules, regulations, policies and procedures applicable to Petitioner'' is supported by reasonable inferences in the record. We agree with the trial court's finding that respondent was not required to find cause as a necessary prerequisite to the valid termination of appellant's employment.

Although appellant's employment was terminable at will, the grievance procedure accorded her was not meaningless. The rights of government employees in their employment have been increasingly scrutinized during the past several years (see Reich, *The New Property,* 73 Yale L.J. 733; *Kast*

v. *Board of Trustees,* 222 Cal.App.2d 8, 14-15 [34 Cal.Rptr. 710]; *Gilmore* v. *Personnel Board,* 161 Cal.App.2d 439, 448-449 [326 P.2d 874]). ■ However, despite the rule that public employees serving at the pleasure of the appointed authority may be terminated without cause and without notice or hearing, it must be noted: ". . . the power [to dismiss public employees] may not be exercised arbitrarily in disregard of the employee's constitutional rights. [*sic*] (*Bagley* v. *Washington Township Hospital Dist.,* 65 Cal.2d 499, 503-504 [55 Cal.Rptr. 401, 421 P.2d 409]; *Rosenfield* v. *Malcolm,* 65 Cal.2d 559, 562-563 [55 Cal.Rptr. 505, 421 P.2d 697] or statutory rights. (*International Assn. of Fire Fighters* v. *County of Merced,* 204 Cal.App.2d 387, 395 [22 Cal.Rptr. 270].) Recent decisions have discredited the notion that the power to dismiss a public employee without cause includes the power to dismiss for any cause." (*Ball* v. *City Council,* 252 Cal.App.2d 136, 141 [60 Cal.Rptr. 139].)

■ Appellant here was not discharged in violation of any public policy, statutory or contractual right. She was discharged because she lacked supervisorial qualifications. She has not been deprived of the right to work as a librarian. It was only her employment at the University that was terminated. The dismissal of appellant here does not raise the constitutional problems caused by the denial of a license (*Schware* v. *Board of Bar Examiners of the State of N.M.,* 353 U.S. 232 [1 L.Ed.2d 796, 77 S.Ct. 752, 64 A.L.R.2d 288]; *Willner* v. *Committee on Character & Fitness,* 373 U.S. 96, 102-103 [10 L.Ed.2d 224, 228-229, 83 S.Ct. 1175]), or the denial of an element essential to employment such as union membership (*Cason* v. *Glass Bottle Blowers Assn.,* 37 Cal.2d 134, 143 [231 P.2d 6, 21 A.L.R.2d 1387]), or the use of stock exchange wire facilities (*Silver* v. *New York Stock Exchange,* 373 U.S. 341, fn. 17, 18 [10 L.Ed.2d 389, 83 S.Ct. 1246]). *Appellant did have the right, however, to have the issues as to her constitutional, statutory and contractual rights and the issues as to the fairness and impartiality of treatment contemplated by the grievance hearing provisions for University employees presented to a hearing officer, and for a final determination by the chancellor and the president of the University.* Appellant was accorded that hearing.

■ Under the procedure established by the board of regents, the decision presented to the trial court to be reviewed is the result of a proceeding in which "(1) by law [the rules of the University at the time she was employed] a

hearing is required to be given; (2) evidence is required to be taken; and (3) the determination of the facts is vested in the inferior tribunal, corporation, board or officer.'' (*Rich* v. *State Board of Optometry,* 235 Cal.App.2d 591, 601 [45 Cal. Rptr. 512]; Code Civ. Proc., § 1094.5; *Housman* v. *Board of Medical Examiners,* 84 Cal.App.2d 308, 312-313 [190 P.2d 653, 192 P.2d 45]; *Boren* v. *State Personnel Board,* 37 Cal.2d 634 [234 P.2d 981]; *Patterson* v. *Philco Corp.,* 252 Cal.App. 2d 63 [60 Cal.Rptr. 110]; Kleps, *Certiorarified Mandamus, Reviewed,* 12 Stan.L.Rev., 554, 559.) The writ of mandamus was the proper procedure for the review of the University's decision to terminate appellant's employment.

Appellant contends that the California Constitution does not delegate to the University the power to make an adjudicatory determination of fact; that she was entitled to a limited trial de novo and an independent evaluation of the facts by the trial court. Here the trial court based its decision to deny the writ on finding that there was substantial evidence produced before the hearing officer to support appellant's dismissal.

▉ It is now settled that where the statewide agency is delegated quasi-judicial power by the Constitution, the reviewing court is limited to determining whether there was substantial evidence supporting the agency's decision.[2] (*Boren* v. *State Personnel Board, supra,* 37 Cal.2d 634, 637; *Rudolph* v. *Athletic Com.,* 177 Cal.App.2d 1, 6 [1 Cal.Rptr. 898]; *Mundell* v. *Department of Alcoholic Beverage Control* 211 Cal.App.2d 231 [27 Cal.Rptr. 62]; *Southern Cal. Jockey Club, Inc.* v. *California etc. Racing Board,* 36 Cal.2d 167 [223 P.2d 1].)

▉ Relative to statewide agencies not created by the Constitution, in *Drummey* v. *State Board of Funeral Directors & Embalmers,* 13 Cal.2d 75 [87 P.2d 848], and *Laisne* v. *California State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457], the now-accepted rule is stated, i.e., a statewide agency does not have the authority to exercise judicial power and absent the constitutional authority, the courts have the right to retry the issue. In *Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304], the trial de novo concept was limited to having the reviewing court exercise an independent

---

[2]Although not applicable here, where an individual's vested or constitutional rights are an issue, the courts will reweigh the evidence and render an independent judgment. (See *Thomas* v. *California Emp. Stabilization Com.,* 39 Cal.2d 501 [247 P.2d 561]; Kleps, *Certiorarified Mandamus,* 12 Stan.L.Rev., 566-567.)

judgment on the facts elicited from the record as well as the law with provision for the receipt of additional evidence by the court in certain cases. (See *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20]; *Rosenfield* v. *Malcolm, supra,* 65 Cal.2d 559; *Stanton* v. *Dumke,* 64 Cal.2d 199 [49 Cal.Rptr. 380, 411 P.2d 108]; *Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67, 72, fns. 3, 4 [64 Cal.Rptr. 785, 435 P.2d 553]; Code Civ. Proc., § 1094.5; Kleps, *Certiorarified Mandamus,* 2 Stan.L.Rev., 285; Netterville, *The Substantial Evidence Rule in California Administration Law,* 8 Stan.L. Rev., 563; Netterville, *Judicial Review,* 44 Cal.L.Rev., 262.)

Here, however, the University is a statewide administrative agency within the meaning of sections 11000 et seq. of the Government Code with powers derived from article IX, section 9, of the California Constitution which provides in part: "The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure compliance with the terms of the endowments of the university and the security of its funds. . . . Said corporation shall also have all the powers necessary or convenient for the effective administration of its trust, including the power to sue and to be sued, to use a seal, and to delegate to its committees or to the faculty of the university, or to others, such authority or functions as it may deem wise; . . ." ( See *Estate of Royer,* 123 Cal. 614 [56 P. 461, 44 L.R.A. 364].)

The authority and powers granted to the University are extensive. There have been many cases involving the regents of the University, but none has involved the question of whether it possesses quasi-judicial power. The regents have been variously described as "an institution of the state," "a public corporation," and "a governmental agency," (*Estate of Royer, supra,* 123 Cal. 614, 619, 620); a "public trust," and "a governmental institution," (*City Street Improv. Co.* v. *Regents etc. Cal.,* 153 Cal. 776, 777, 779 [96 P. 801, 18 L.R.A. N.S. 451]); "a constitutional department or function of the state government," (*Williams* v. *Wheeler,* 23 Cal.App. 619, 622 [138 P. 937]; "a governmental function." (*Davis* v. *Board of Regents, etc. Cal.,* 66 Cal.App. 693, 696 [227 P. 243]); "a state institution" (*Estate of Purington,* 199 Cal.

661, 666 [250 P. 657]); and "a branch of the state itself," (*Pennington* v. *Bonelli,* 15 Cal.App.2d 316, 321 [59 P.2d 448]). (See also 30 Ops.Cal.Atty. Gen. 162, 166; *Newmarker* v. *Regents of University of Cal.,* 160 Cal.App.2d 640 [324 P.2d 558].)

The Attorney General,[3] in commenting on the autonomy granted the regents, stated: ". . . It is a constitutional corporation or department and constitutes a branch of the state government equal and coordinate with the legislature, the judiciary and the executive. [Citations.] . . . The Regents, not the legislature, have the general rule-making or policy-making power in regard to the University. . . . It is clear, however, that the power of the Regents to operate, control and administer the university is virtually exclusive." (30 Ops. Cal.Atty.Gen., 162, 166.)

Although article IX, section 9, of the California Constitution does not specifically refer to judicial powers, the language "with full powers of organization and government" and "all the powers necessary or convenient for the effective administration of the trust . . ." necessarily includes the delegation of such powers. The only limitation placed on the regents in the administration of the University is "subject only to such legislative control as may be necessary to insure compliance with the terms of the endowments of the university . . ." ▪ It is therefore concluded that the University is a statewide administrative agency possessing adjudicatory powers derived from the Constitution as to the problems and purposes of its personnel. The trial court correctly limited its review to a determination that there was substantial evidence supporting the hearing officer's recommendation and the final decision by the president. (See *Newmarker* v. *Regents of University of Cal., supra,* 160 Cal.App. 2d 640; *Boren* v. *State Personnel Board, supra,* 37 Cal.2d 634; *Bertch* v. *Social Welfare Dept.,* 45 Cal.2d 524, 529 [289 P.2d 485].)

Appellant finally contends that there was no credible or competent evidence which substantially supported the finding of the hearing officer that she lacked supervisorial capacities and therefore the trial court erred in so finding. "In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences

---

[3] It is to be noted that the University and the board of regents have independent counsel and are not represented by the Attorney General of of the State of California.

indulged in to uphold the verdict [or judgment of trial court] if possible." (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183] ; see also *Estate of Bristol*, 23 Cal.2d 221, 223-224 [143 P.2d 689].)

The record discloses (1) that there was evidence of a high employee turnover in appellant's library department; (2) that appellant on a number of occasions was given notice that her supervisorial practices were a cause of concern and should be corrected and that letters of complaint had been received about her. On one occasion appellant was informed that although her training practices and communications to employees were poor, she disregarded help in correcting her deficiencies, and (3) three witnesses who had been employed under appellant testified as to great stress and tension in her department. There was also evidence favorable to appellant that her qualifications as a librarian were excellent. It is significant to note that every present employee testified as to her good supervision and to a desire to have her back. The conflicts as to appellant's supervisorial qualities, however, were resolved adversely to her. No question was otherwise raised as to appellant's professional competence. It is settled that the trial court's decision must be sustained in the presence of the substantial conflicting evidence concerning her supervisorial abilities. (See *Moran* v. *Board of Medical Examiners, supra,* 32 Cal.2d 301; *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 71, 72.) Therefore the trial court did not err in its finding that the hearing officer's recommendation was based on substantial evidence.

It is concluded that appellant was not one of the specified academic employees whose employment could be terminated only for cause; that appellant was accorded the hearing to which she was entitled under the University's grievance procedure; that the University is a constitutional agency with adjudicatory powers as to its personnel, and that there was substantial evidence supporting the trial court's findings and judgment.

The judgment is affirmed.

Draper, P. J., and Salsman, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 24, 1968. Mosk, J., was of the opinion that the petition should be granted.